IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No.  09-cv-01007-RBJ-MJW

CELLPORT SYSTEMS, INC.,

     Plaintiff,

v.

PEIKER ACUSTIC GMBH & CO. KG,

     Defendant.

---

## ORDER ON PENDING MOTIONS

---

     Two motions, one objection to an order of a magistrate judge, and the parties' claims construction disputes are pending.  The Court has reviewed the parties' briefs and heard oral argument on January 24, 2012.

### Jurisdiction

     This case was removed to this Court from the Boulder District Court in April, 2009 based upon diversity of citizenship and federal question jurisdiction.  Federal jurisdiction is not disputed.

### Facts

     Cellport Systems, Inc. ("Cellport"), a Colorado corporation, designs and develops technology that, among other things, enables mobile phones to be connected to the audio, power and antenna system of vehicles on a hands-free basis.  Peiker Acustic GMGH & Co.KG ("Peiker"), a German corporation, develops and sells hands-free components for mobile phones and hands-free car kits.

On October 1, 2004 Cellport and Peiker entered into a "License Agreement" (the "Agreement") whereunder Cellport permitted Peiker to incorporate certain Cellport proprietary technology into "Licensed Products" in exchange for royalty payments.  Cellport now claims that Peiker has not paid the royalties as agreed, in breach of section 3.1 of the Agreement, and that Peiker has not provided complete and accurate statements of its sales of Licensed Products, in breach of section 3.3 of the Agreement.  In addition to asserting various denials and other defenses, Peiker counterclaims for a declaration of noninfringement of the Cellport patents that it claims are material to the case and for reimbursement of what it claims has been overpayment of royalties due under the Agreement.

## I.    DEFENDANT PEIKER'S MOTION TO BIFURCATE CONTRACT INTERPRETATION ISSUES [#116]

In a hearing on July 7, 2010 Judge Krieger, responding to comments of counsel, suggested that "bifurcation" of contract interpretation issues might be helpful to the parties. Peiker then filed motions to bifurcate and for a ruling on contract interpretation.  Because the latter motion has been fully briefed, the bifurcation motion is DENIED AS MOOT.

## II.   DEFENDANT PEIKER'S MOTION FOR RULING AS A MATTER OF LAW ON CONTRACT INTERPRETATION [#117]

The parties have a fundamental disagreement about the scope of the Agreement.  Peiker argues that Cellport can only claim royalties on products that practice Cellport's patents. Cellport responds that it is entitled to royalties on the sale of "Licensed Products," and that infringement analysis is not necessary.  Both parties seek the Court's resolution of that dispute.

### A.  Relevant Portions of the Agreement.

The following portions of the Agreement are germane to the dispute.

1.  Recitals.  The introductory clauses in the Agreement provide, in relevant part:

Whereas Licensee manufactures components for products that would benefit substantially from incorporating the technology described in the Licensed Patents;

Whereas the purpose of this Agreement is to make such technology available to the Licensee, so that the Licensee may incorporate the technology into the Licensed Products, all on the terms set forth below.

2.  <u>Definitions</u>.

Section 1.6 defines "Licensed Patents" to mean "the patents and other rights listed in Schedule A."  Schedule A contains a list of patents and patent applications and a further explanation of the scope of the patents and applications.

Section 1.3 defines "Pocket" as "an interchangeable component of a Universal Mobile Connectivity Product that includes a separate Docking Station."  Agreement § 1.13.

Section 1.4 defines "Docking Plate" to mean "a device or module which is configured to hold a Pocket and establish connectivity between the portable wireless device held by such Pocket and vehicle resources such as power, audio, antenna and/or other vehicle electronics, either directly or through a Docking Station."

Section 1.5 defines "Docking Station" as "a component of a Universal Mobile Connectivity Product, which utilizes Pockets, other than the Pocket." When a Docking Station interfaces with a "Pocket" through a "Docking Plate" it is sometimes referred to as a "TCU."

Section 1.8 defines "Licensed Products" to mean "any of Universal Mobile Connectivity Products, Uniphones, Docking Stations and Pockets."

Section 1.16 defines "Uniphone" to mean "a system for using portable wireless devices in vehicles that combine the principal features of a Pocket and Docking Station in a single component and which establishes connectivity with vehicle resources such as power, audio, antenna and/or other vehicle electronics through a Docking Plate that will also connect Uniphone systems for other portable wireless devices to such vehicle resources."

Section 1.17 defines "Universal Mobile Connectivity Products" to mean

"(i) systems, devices or sets of components for using portable wireless devices in vehicles, that work with more than one make of portable wireless device by substituting interchangeable Pockets that establish a physical, electrical and/or logical interface for the portable device to the remaining components of the system, and consisting of a Pocket/Docking Station configuration, Pocket/Docking Plate/Docking Station configuration, or Pocket/Docking Plate/TCU configuration, which the Parties acknowledge utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents;

(ii) Uniphones, which the Parties acknowledge utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents; or

(iii) any other systems, devices or sets of components for using portable wireless devices in vehicles, or any one or more elements or components thereof, which utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents.

3. Royalty.

Section 3.1 of the Agreement requires that Peiker pay a royalty "based upon the total number of Licensed Products sold, distributed or delivered."  Section 3.1 goes on to provide that "the Royalties hereunder are in consideration for Licensee's rights under the several patents included in Licensed Patents."  And, "in the event that any one or more of the patents or any claims thereunder is found to be invalid, unenforceable or otherwise compromised, the foregoing royalties will continue to accrue, without diminution, in consideration for those remaining patents and claims as they still may apply to the Licensed Products."

4.  Existing Products.

Section 3.5 of the Agreement, entitled "Existing Products, etc.," provides:

Licensee acknowledges that (a) the cradle it is currently supplying to Daimler-Chrysler AG pursuant to a supply agreement with Motorola uses certain parts of the claims of the Licensed Patents and as such are Pockets; (b) that the full systems it will supply to Volkswagen will use parts of the claims of the Licensed Patents and as such will be Universal Mobile Connectivity Products; and (c) the full systems it may sell, distribute or deliver, consisting of pocket adaptors, docking plates and electronic box, comparable to the ALAC GmbH 'Uniline' product, would be Universal Mobile Connectivity Products, and accordingly all of such foregoing products and components are, and any substantially similar products and components would be, Licensed Products, the manufacture, sale, distribution or delivery of which would infringe one or more claims of the Licensed Patents, and that Royalties are due in respect of any manufacture, sale, distribution or delivery of said Licensed Products by Licensee.

5.  Term.

Section 8.1 of the Agreement provides that "[t]he term of this Agreement shall extend from the date of this Agreement first above written until expiration of each of the underlying patents unless and until this Agreement is terminated pursuant to Section 8.2 hereof (the 'Term')."

**B.  Construction.**

1.  Licensed Products.

Peiker must pay royalties on the sale, distribution or delivery of "Licensed Products."  Agreement ¶3.1.  The parties' dispute concerns what is a "Licensed Product," and more specifically, whether a "Licensed Product" necessarily utilizes technology covered by Cellport's "Licensed Patents."

The term "Licensed Products" is defined to mean "any of Universal Mobile Connectivity Products, Uniphones, Docking Stations, and Pockets."  *Id.* at § 1.8. Uniphones are defined in section 1.16; however, the parties have indicated that

Uniphones were never manufactured.  "Docking Station" is defined to mean the components of a "Universal Mobile Connectivity Product" other than the Pocket.  It interfaces with the Pocket either directly or through a Docking Plate, in which case the Docking station can be called a telematics control unit or "TCU".  It also interfaces with the vehicle's power and audio systems.  § 1.5.  A Pocket is the part of a "Universal Mobile Connectivity Product," i.e., the part that interfaces with the portable wireless device and with the Docking Station.  § 1.13.

Because a "Universal Mobile Connectivity Product" is simply the combination of the Docking Station and the Pocket, a key to defining "Licensed Products" is the definition of "Universal Mobile Connectivity Products" in section 1.17 of the Agreement.  If a product is a "Universal Mobile Connectivity Product" it is a Licensed Product.  If it is not a "Universal Mobile Connectivity Product" it is not a Licensed Product.

The definition of "Universal Mobile Connectivity Product" has three categories of products.  If a product fits any one of the three categories, it is a "Universal Mobile Connectivity Product."

- Section 1.17(i) consists of "systems, devices or sets of components for using portable wireless devices in vehicles . . . consisting of a Pocket/Docking Station configuration, Pocket/Docking Plate/Docking Station configuration, or Pocket/Docking Plate/TCU configuration, which the Parties acknowledge utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents."

- Section 1.17(ii) consists of "Uniphones which the Parties acknowledge utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents."

- Section 1.17(iii) consists of "any other systems, devices or sets of components for using portable wireless devices in vehicles . . . which utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents."

The parties have sharply different views of the meaning of section 1.17, and that dispute is at the heart of Peiker's motion for a ruling of law.

2. Peiker's position.

Peiker approaches the task of interpreting section 1.17 somewhat indirectly. Citing familiar law that courts should construe contractual language in the context of all of the contract's provisions, *e.g., Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 911-12 (Colo. 1996), Peiker begins its analysis with an entirely different section of the contract.

Section 3.5, entitled "Existing Products, etc.," sets forth Peiker's acknowledgement that a cradle it was then supplying to Daimler-Chrysler (apparently known as the "CKII" product according to the parties' briefs) uses parts of the claims of the Licensed Products and is a Pocket.  Section 3.5 identifies two other products that Peiker might (but apparently never did) develop  -- a system that it might supply to Volkswagen, and a system comparable to Peiker's "ALAC Gmbri 'Uniline' product. These products would, if sold, distributed or delivered, have been "Universal Mobile Connectivity Products."  Therefore, all of these three identified products are acknowledged to be subject to the royalty obligation to Cellport.

Section 3.5 then states that "any substantially similar products and components would be Licensed Products, the manufacture, sale, distribution or delivery of which would infringe one or more claims of the Licensed Patents," thereby requiring the payment of royalties to Cellport. Peiker argues that this clause refers only to then-existing products. I disagree. There is no such limitation in the language of the section (or even in its heading, which includes the mysterious "etc."). Rather, the Court concludes as a matter of law that the "substantially similar" clause includes products substantially similar to any of the three identified products and systems, whether then existing or not.

Peiker ties its interpretation of section 3.5 to sections 1.17(i) and (ii), suggesting that these are "catch-all" clauses for existing products. Not only do I disagree with the initial premise concerning section 3.5, but I find nothing in the language of section 1.17(i) or (ii) that necessarily limits their reach to existing products. Moreover, the fact that section 1.17(ii) concerns Uniphones, which Peiker acknowledges have never been manufactured, is an indication that that subsection, at least, is not limited to then-existing products.

As discussed below, I do not disagree with Peiker's ultimate argument that this case requires infringement analysis. I simply note that I do not agree with Peiker's interpretation of these key terms.

3. Cellport's position.

Cellport places substantial emphasis on the phrase "which the Parties acknowledge utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents." This phrase is found in subsections 1.17(i) and

(ii).  However, the words "the Parties acknowledge" is not found in the otherwise identical phrase in subsection 1.17(iii).  Cellport argues that by inserting "which the Parties acknowledge" into subsection (i), the parties were deeming that any product that (1) is a system, device or set of components for using a portable wireless device in vehicles, and (2) has either a Pocket/Docking Station or a Pocket/Docket Plate/Docking Station or a Pocket/Docking Plate/TCU configuration is a "Universal Mobile Connectivity Product" and, therefore, is a Licensed Product.

In other words, Cellport argues that the parties created what in substance is an irrebuttable presumption that products fitting these criteria are Licensed Products, **whether or not they use any technology covered by the Licensed Patents.**  That is why Cellport insists that this case is a breach of contract case, not a patent infringement case.  Cellport acknowledges that it has the burden of proving that products being sold, distributed or delivered by Peiker fit the criteria (system, device or components for using a portable wireless device in a vehicle and one of the three configurations).  However, if they meet that burden, then, under Cellport's interpretation of subsection 1.17(i), Cellport is entitled to royalties and perhaps other relief.  Under this theory, only if Cellport contends that a Peiker product falls within subsection 1.17(iii) and not subsections (i) or (ii) will it have to prove that the product does utilize technology covered by the Licensed Patents, i.e., prove infringement.

The argument is a plausible interpretation of subsection 1.17(i).  Peiker argues that an attempt to obtain royalties for something that does not actually use Cellport's patented technology would amount to patent misuse.  I disagree.  This was an Agreement between two sophisticated companies represented at all times by counsel.  They could

agree, if they wished, to deem something to be a Licensed Product even without knowing

for sure whether it used technology covered by the Licensed Patents.  As Cellport's

counsel argued, parties could rationally enter into such an agreement to avoid the delays

and expense inherent in infringement litigation.  However, for the reasons set forth

below, I do not agree that that is what the parties did here.

4.  The Court's Interpretation.

I disagree with Cellport's interpretation for three reasons.

First, the language of subsection 1.17(i) does not explicitly and clearly state that a

product fitting within the criteria of that subsection would not only be deemed to be a

"Universal Mobile Connectivity Product" but that this presumption could not be

challenged.  It would have been quite easy to say this, but the Agreement does not.

Second, no extrinsic evidence of the parties' intent was offered.  Given the age of

the case, I would think that if there were evidence that the parties intended to create what

amounts to an irrebuttable presumption, it would have been presented.  Cellport informs

the Court that the Agreement was part of a settlement of previous infringement litigation

between the parties, and counsel asks, rhetorically, why Cellport would have agreed to

settle the prior lawsuit and enter into the Agreement if it had to go through expensive

infringement litigation every time Peiker, a larger and better financed company, develops

and sells a new product.  Peiker might ask, rhetorically, why it would agree to pay

royalties on the sale of products that do not use technology covered by Cellport's patents.

The Court cannot speculate as to intent of the parties.

Third, the interpretation urged by Cellport is not consistent with other parts of the

Agreement.  I begin with the recitals.  "Whereas clauses" are generally viewed as being

merely introductory.  *See Vail Resorts, Inc. v. U.S.,* 2011 WL 2621361, at *7 (D. Colo. July 1, 2011).  However, "whereas clauses" can assist in determining the parties' intent. *Innovatier, Inc. v. CardXX, Inc.,* 2010 WL 5422587, at *6 (D. Colo. Dec. 27, 2010).  The parties plainly stated in the recitals of this Agreement that the purpose of the Agreement was to permit Peiker to incorporate technology covered by the "Licensed Patents" into "Licensed Products."

Section 3.1 of the Agreement, which provides that royalties are payable on the sale, distribution or delivery of Licensed Products, further states in plain language that the royalties "are in consideration for Licensee's rights under the several patents included in Licensed Patents."  In addition, section 3.1 provides that if a patent within the Licensed Patents were declared to be invalid, the royalty obligation would continue so long as the remaining patents and claims "still may apply to the Licensed Products."  These provisions support the interpretation that royalties are due only on the sale, distribution or delivery of products that use technology covered by the Licensed Patents.

The Agreement terminates upon the expiration of all of the underlying patents. Section 8.1.  This too indicates that the parties intended to tie the license to the use of the technology covered by the Licensed Patents.

Thus, if the meaning of sections 1.17 and 3.5 is ambiguous, and arguably it is, then the contract taken as a whole provides a good clue as to how the ambiguity should be resolved.

For all these reasons, the Court interprets subsection 1.17(i) as creating what in substance is a rebuttable presumption.  If a product is a system, device or set of components for using portable wireless devices in a vehicle, and it fits within one of the

three described configurations, it is presumed that it utilizes technology, designs or architectures covered by one or more of the claims included in the Licensed Patents and is a Licensed Product. Similarly, if a product is "substantially similar to one of the three identified "existing products" in section 3.5, then it is presumed that it is a Licensed Product. However, if Peiker chooses to attempt to rebut the presumption by presenting evidence that a given product does not in fact use any technology covered by a Licensed Patent and does not infringe a Licensed Patent, it may do so. Peiker has elected to attempt to rebut the presumption.

Because the foregoing is the Court's ruling on construction of the disputed portions of the Agreement, motion #117 is GRANTED.

### III.  PLAINTIFF'S OBJECTION TO MAGISTRATE'S ORDER REGARDING DEFENDANT PEIKER'S MOTION TO STRIKE CELLPORT'S JURY DEMAND [#149]

Section 10.4 of the Agreement provides:

10.4 *Mediation.*  Cellport and Licensee will attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in good faith and spirit of mutual cooperation. Disputes among the Parties will be first submitted to senior executives of Cellport and Licensee for resolution. If the executives are unable to resolve the dispute within thirty (30) days, either Party may refer the dispute to non-binding mediation that will be held either in Boulder, Colorado or Washington, D.C., in the sole discretion of Cellport. The Parties will share the cost of the mediation equally, except that each Party will pay its own attorney's fees. Within ten (10) days after written notice demanding mediation, the Parties will choose a mutually acceptable mediator, and the mediation will be held within thirty (30) days after the mediator is selected. Neither Party will unreasonably withhold consent to the selection of the mediator. Use of any dispute resolution procedure will not be construed under the doctrine of laches, waiver, or estoppel to adversely affect the rights of either Party. *Nothing herein prevents either Party from resorting directly to judicial proceedings if the dispute is with respect to intellectual property rights, **provided** that there will be no jury trial.*

(emphasis added, except that the word "provided" was italicized in the original).

There is no dispute that the parties, including their senior executives, attempted unsuccessfully to resolve the disputes that have given rise to this litigation through consultation and negotiation.  The parties express different views as to why the disputes were not referred to non-binding mediation.  However, those issues are not relevant to the jury issue.

When plaintiff filed this lawsuit in March 2009 it demanded a jury trial.  Peiker did not initially object.  On the contrary, the Scheduling Order entered by Magistrate Judge Watanabe on January 14, 2010, following a scheduling conference in which both parties participated, indicates that "[t]he parties anticipate that the length of jury trial will be eight to ten days."  Plaintiff has pointed to several places in later pleadings filed by Peiker in which Peiker seemed to acknowledge that this would be a jury trial.

Nevertheless, on December 16, 2010 Peiker filed a motion to strike Cellport's jury demand, based upon the last sentence of section 10.4 of the agreement.  After full briefing, the magistrate judge entered an order granting the motion to strike the jury demand.  [#143].  Citing law indicating that parties may agree contractually to waive their right to a jury trial, and that a motion to strike a jury demand can be made at any time, the magistrate judge concluded that Cellport "freely, voluntarily, knowingly, and intentionally agreed to contractually waive its right to trial by jury in this action."  Order at ¶9.

Plaintiff objects to that order on grounds that (1) Cellport did not resort directly to judicial proceedings; (2) the fact that no mediation took place did not constitute a waiver of Cellport's right to a jury trial; (3) Cellport did not in any other manner waive its right to a jury trial; (4) there is a strong presumption in favor of jury trials; and (5) Peiker

waived its right to object to Cellport's jury demand by acknowledging that the case would be tried to a jury and then waiting nearly a year to file its motion to strike the jury demand.

The Court may modify or set aside any part of a magistrate judge's order on a nondispositive matter that is clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a).  The one finding of the magistrate judge that is disputed as a matter of fact and arguably is clearly erroneous is his finding "[t]hat Plaintiff Cellport never requested or conducted mediation as permitted under Section 10.4 of the License Agreement above but instead elected to resort directly to judicial proceedings by filing this case."  Order at ¶8.  However, that finding is irrelevant to the resolution of the objection.

Paragraph 10.4 of the Agreement provides that when a dispute arises under the Agreement, the parties must first engage in consultation and negotiation, including submission of the dispute to the parties' senior executives.  Arguably there is an ambiguity as to whether a party could "resort" to judicial proceedings without first engaging in the mandatory consultation and negotiation.  However, that is moot in this case, as the parties agree that consultation and negotiation was done.  At that point, either party could "resort" to judicial proceedings.  In plain and unambiguous language, the parties agreed that, if that occurred, "there will be no jury trial."

The law is clear that the right to a jury trial can be contractually waived.  *Telum, Inc. v. E.F. Hutton Credit Corp.,* 859 F.2d 835, 837 (10th Cir. 1988).  There has never been a suggestion that either of the parties to the Agreement was unsophisticated, unrepresented by counsel, or was in any sense forced by the other party to accept the jury waiver in the Agreement.  The magistrate judge correctly cited authorities holding that a

party may move to strike a jury demand at any time. *See, e.g., Mowbray v. Zumot,* 536 F. Supp. 2d 617, 621 (D. Md. 2008)("even on the eve of trial"). Cellport cites no authority holding that Peiker's initial agreement that this could be a jury case constitutes a waiver of its right to move to strike the jury demand. Peiker apparently changed its mind and elected to enforce a contractual right to which both parties agreed. Cellport has not suggested that the delay in enforcing this contractual provision has caused it to suffer prejudice. The case has not even been set for trial as of yet.

I do not disagree that there is a presumption in favor of jury trials. However, the contract says what it says. Accordingly, the objection is DENIED, and the order of the magistrate judge is AFFIRMED.

## IV.   CLAIM CONSTRUCTION (MARKMAN ISSUES).

Claim construction is a matter of law for the Court. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 384-91 (1996). The objective is to give disputed terms in a patent claim the meaning that a person of ordinary skill in the relevant art would have given them at the time of the invention unless the patent applicant has clearly and unambiguously defined the terms differently. *See, e.g., Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 493 F.3d 1358, 1361 (Fed. Cir. 2007).

The Court principally considers "intrinsic evidence," i.e., the words of the claim itself in the context of the entire patent including as relevant the specification and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-17 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170 (2006). The specification is "the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). The court may not, however,

read limitations from the specification, particularly the disclosed embodiments, into the claim. *Phillips,* 415 F. 3d at 1323-24.

"Extrinsic evidence" such as dictionaries, treatises and, in some cases, expert testimony can also be considered, although such evidence generally should be given less weight than intrinsic evidence.  *Phillips,* 415 F.3d at 1317-19.  In the present case, with the exception of one reference to a dictionary definition, the parties have relied entirely on intrinsic evidence.

The disputed terms in this case are found in Claim 9 of U.S. Patent 6,341, 218 ("the '218 Patent") and Claims 8, 9, 10 and 21 of U.S. Patent 6,377,825 ("the '825 Patent").  Starting with a total list of 21 disputed terms in the '218 Patent and 18 disputed terms in the '825 Patent, the parties have narrowed the list to 13 terms between the two patents.  The Court construes those terms as set forth below.

## '218 Patent

This patent has the title, "Supporting and Connecting a Portable Phone."  The invention is an apparatus that includes a "pocket" into which a portable electronic device such as a mobile phone can be placed, an interface module into which the pocket can be placed, and a method of latching the units together to facilitate hands-free operation of the phone or other device while driving.

### A.  The Claim.

The '218 patent includes 46 claims, but the disputed terms requiring construction are identified only in Claim 9.  This claim reads as follows (disputed terms bolded):

An **adaptor** for hands-free operation of a portable phone, comprising:

a pocket member having **a receiving section** and **a mounting section**, said **receiving section** disposed on the front of said pocket member and adapted to receive a portable phone, a first latching mechanism disposed within said pocket member to secure the portable phone within said **receiving section**,

16

said **mounting section** disposed on the back of said pocket member and having a plurality of apertures for engagement with **second latching mechanism** in an interface module, a first connector interfacing with the electronics of the interface module, and a second connector interfacing with the electronics of the portable phone;

an interface module having a **receiving section** disposed on the front of said interface module and configured to mate with said **mounting section** of said pocket member, a **second latching mechanism** independent of said first latching mechanism to retain said pocket member in said receiving section and movable between **a first position in which the pocket member is not engaged by said latching mechanism, and a second position in which said pocket member is engaged by said latching mechanism**[1] and comprising a plurality of latch members disposed for alignment with said apertures of said **mounting section** of said pocket member when said pocket member is mated with said interface module, and a connector interfacing with said first connector of said pocket member;

wherein **when said mounting section of said pocket member is seated within said receiving section of said interface module said latch members extend through said apertures and move from said first position to said second position to secure said interface module to said pocket member**.

**B.  Construction.**

1.  "<u>adaptor</u>"

Cellport proposes "[a] device for adapting an apparatus for uses not originally intended," arguing that this is the ordinary and customary meaning of the word.  Peiker proposes "[a] device possessing the elements set forth in the claim, enabling the dialing or operation of a portable phone without manually touching the phone itself," citing the Specification, Col. 1: 42-60.

Defining "adaptor" to mean "a device possessing the elements set forth in the claim" is not to define the term at all.  I do not disagree with Peiker that Claim 9 is limited to hands free operation of a portable phone.  The words are clear and stand in contrast to, for example, Claim 23 which has the preamble "[a]n adaptor for hands-free operation of a portable electronic device,

---

[1] Claim 9 originally and incorrectly used the phrase "a first position in which the pocket member is engaged by said latching mechanism, and a second position in which said pocket member is not engaged by said latching mechanism" in the second element.  The parties agree that this was corrected on re-examination to state that the pocket member is not engaged in the first position but is engaged in the second position.

and Claim 37 which has the preamble "[a] system of interchangeable adaptors for use with a variety of personal electronic devices." This is not, as in the case cited by Cellport, a preamble that is so terse and generic as not to require construction at all. *Honeywell Intern., Inc. v. Nikon Corp.,* 589 F. Supp. 2d 433, 438-89 (D. Del. 2008)(discussing the preamble "A display apparatus").

However, Cellport's generic definition better suits the word "adaptor" by itself and is accepted and adopted by the Court. This is consistent with the use of the word "adaptor" throughout the claims (the word is used expressly in 34 of the 46 claims and implicitly the others) and throughout the Specification. For example, the Abstract describes "[a]n *adaptor* for supporting and connecting a portable electronic device, such as a portable phone, computer or other wireless communication device." (emphasis added).

2. "a receiving section in interface module"

This phrase actually used in Claim 9 is "said receiving section of said interface module." Cellport proposes to define "receiving section," which is found in all three elements of Claim 9 and throughout the claims in the '218 Patent, to mean "[a] part of the apparatus designed to support and connect with another apparatus or device." Cellport cites the Specification at Col. 3: 20-21. Peiker suggests that "receiving section" requires no construction. However, Peiker defines the phrase "a receiving section in interface module" to mean "[f]ront surface of the interface module that includes a plurality of raised flanges or side walls, designed so as to seat the mounting section of a pocket member within the interface module." Peiker cites the Specification at figures 3, 4, 9, 10, 11, 12; Col. 3: 40-65; Col. 7:62 to Col. 8:34; Col. 9:14-54; and the Prosecution History – Amendment and Response dated June 26, 2001, page 17.

The "receiving section" is the part of the apparatus into which another part of the apparatus is inserted, much as power outlets on a wall are the receiving section for the "male" plug at the end of a lamp cord.  That is true no matter where the term is used in the Claim.

The phrase "said receiving section of said interface module" refers back to the receiving section in the "interface module," which is described in the second element of Claim 9.  That is a receiving section "disposed on the front of said interface module and configured to mate with said mounting system of said pocket member."  The Court has no option but to define the specific phrase as the Claim does.

More importantly, the Court recognizes that the '218 Patent teaches a latching system whereby the wireless communication device is mounted on the pocket, and the pocket is mounted on the interface module, by means of protuberances in the receiving sections that mate with apertures in the mounting sections.  The precise numbers and shapes of the protuberances and apertures are limitations in the preferred embodiment that cannot be imported into the claim.

3.  "a mounting section"

Cellport proposes, "[a] part of an apparatus or device designed to mount on and connect with a corresponding receiving section," citing "Claim 9" as its authority.  Peiker counters with, "[i]ndented raised ridges along the side walls of the rear shell of the pocket member designated to correspond and mate with the raised flanges on the interface module, and includes an outwardly extending pin for activating the latching mechanism."  Peiker cites Figures 3 and 4; Col. 7:62-8:63.

The Court finds that Cellport's proposed definition is too general.  Peiker's proposed definition imports limitations from the preferred embodiment into the claim.  As indicated above, the Court's definition of "a mounting section" in this claim is a series of apertures into which

protuberances on the receiving section are inserted so as mechanically to latch the wireless communication device to the pocket and the pocket to the interface module.

    4.  "second latching mechanism"

Cellport proposes "[a] fastening device," citing "ordinary and customary meaning." Peiker proposes, "[a] device that engages using a limited, one-dimensional motion of the pocket member to interface module, having a plurality of protuberances on the interface module that correspond and mate with apertures on the pocket member, which are moveable from a first position to a second position to engage the interface module to the pocket." Peiker cites Figures 3, 4, 9, 10, 11, and 12; Col. 3:40-65; Col. 7:62-8:34; Col. 9:14-54; Prosecution History – Amendment and Response dated June 26, 2001, page 17.

Cellport' proposal is not helpful, because it does not focus on the way in which the phrase as used in this claim would be understood by a person of ordinary skill in the relevant art. The "first latching mechanism" in Claim 9 is the mechanism by which the phone is secured to the Pocket. The "second latching mechanism" in Claim 9 refers to a mechanism by which the mounting section of the Pocket latches to the receiving section of the interface module using protuberances designed to fit into apertures in the Pocket.

The more basic dispute posed by the dueling definitions is whether a "one-dimensional motion" is fundamental to the invention or is a limitation of a preferred embodiment. The Court can perhaps provide guidance to the parties by distinguishing what it views as key to this invention from what is a limitation in the preferred embodiment shown in the drawings.

The invention does, of course, provide "hands free" use of a wireless communication device, such as a mobile phone, in a vehicle. While that is basic to the invention, it does not distinguish the invention from prior art. Two key aspects of the invention do distinguish it from,

and improve upon, prior art.  First, it is adaptable to a variety of wireless communication devices, such as mobile phones, by utilizing a multitude of pockets, each designed to receive a particular make or model of wireless communication device but also to mate with a universal interface module.  Abstract; Col. 1: 6-11, 61-Col 2:14; Col. 3: 24-31.  Second, it allows the user to insert the pocket into the interface module with a limited, a one-dimensional movement.  Abstract; Col. 2: 50-Col. 3: 5; Col. 3: 40-49.

Cellport does not seriously dispute that adaptability of the system to wireless communication devices having different physical characteristics is fundamental to the invention. Cellport argues, however, that one-dimensional movement is not "the invention" but instead is a feature of the preferred embodiment that cannot be imported into the claim.  Cellport notes that Claim 21, a dependent claim of Claim 9, expresses the "limited, one-dimensional movement of either said pocket member or said interface module relative to the other," and argues that this (like a similar contrast between independent Claim 33 and dependent Claim 34) creates a presumption that this limitation is not present in the independent claim.  Cellport Reply at 19-20 (citing *Phillips,* 415 F.3d at 1315).  However, the Specification in the places cited above convinces me that one-dimensional movement was considered by the inventors to be a key improvement over prior art and fundamental to "the invention."  *See Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1480 (Fed. Cir. 1998)("the doctrine of claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence.").  *See also MarcTec v. Johnson & Johnson,* 394 Fed. Appx. 685, 687 (Fed. Cir. 2010)(citing *Multiform Desiccants* and affirming the district court's construction of an independent claim even if it rendered a term in a dependent claim superfluous).

5. "a second position in which the pocket member is engaged by"
   "a first position in which said pocket member is not engaged by"

Cellport proposes that the second position is a position in which the latching mechanism secures the Pocket to the interface module, whereas the first position is a position in which the latching mechanism does not secure the Pocket to the interface module.  Cellport cites Col. 3:54-57.  Peiker proposes that "a second position" be construed to mean "[a] fixed or static position of the second latching system, different from the first position, whereby the pocket is fully engaged within the interface module; the 'second' position cannot be the same position as when the pocket is fully disengaged from the interface module."  Peiker's construction of the "first position" is "[a] fixed or static position of the second latching mechanism that is the at-rest position prior to when the pocket is engaged with the interface module."  Peiker cites Figures 9-12; Col. 9:51-54; Col. 10: 30-60; Col. 11: 45-62; Reexamination Prosecution History – Amendment and Response to Office Action in *Inter Partes* Reexamination dated November 13, 2005, p. 28-29 and November 14, 2005, p. 16.

I note that the reference cited by Cellport in the Joint Claim Construction Chart, Col: 3: 54-57, does not directly address these terms.  However, the previous sentence does, and it emphasizes the one-dimensional movement discussed above: "As the pocket member is seated in the interface module using a short one dimensional movement of the pocket member, the latching mechanism moves from a first unengaged position to a second engaged position to secure the pocket member to the interface module."  Col. 3: 50-54.

Peiker cites the Prosecution History, specifically Cellport's efforts to distinguish the Braitberg patent wherein the latching mechanism that retains the pocket in the receiving section of the interface module is in the same position whether or not the pocket is interconnected to the base unit, with Cellport's invention, whereunder the latching mechanism of the receiving section

is in a different position when the pocket is not engaged than its position when the pocket is engaged. Cellport essentially argues that it is not bound by statements of its attorney in the reexamination process. I do not agree. *Cf. Computer Docking Station Corp. v. Dell, Inc.,* 519 F.3d 1366, 1374-75 ("Claims should not be construed one way in order to obtain their allowance and in a different way against accused infringers"). With the exception of the words "fixed and static," I accept and adopt Peiker's proposed construction. However, I do not view this as materially different from Cellport's proposed construction or from the wording of the claim itself.

6. "<u>when said mounting section of said pocket member is seated within said receiving section of said interface module said latch members extend through said apertures and move from said first position to said second position to secure said interface module to said pocket member</u>"

Cellport states that no construction is needed. Peiker proposes, "[t]he pocket must be mated and engaged with the interface module using only a limited, one-dimensional motion." The Court finds that the components of this clause and the Court's conclusion that a "one-dimensional motion" is a key improvement over prior art and therefore fundamental to this invention have been adequately addressed above. The Court therefore concludes that this clause needs no further construction.

## '825 Patent

The '825 Patent" is entitled "Hands-Free Communication in a Vehicle." Whereas the '218 Patent focused on a mechanical latching system connecting a wireless communication device through a pocket and an interface module to the vehicle, the '825 Patent focuses on electronic connections. Various embodiments include combinations of pockets with an interface module that enable the user to choose features ranging from the most basic (using the mobile phone example, a system that provides electric power, charges the phone's battery, and has a

speaker phone function) to the most sophisticated (including text to speech capability) that fit the user's needs and budget.  The parties dispute terms in four of the 21 claims in the patent, which are bolded below.

### A.  The Claims.

### Claim 8

A method involving communications in a vehicle, comprising:

**providing** a first communication device for at least temporary use in the vehicle, a first holding assembly for holding said first communication device at least while said first communication device is in the vehicle and an interface module, and with said first communication device, said first holding assembly and said interface module being **electrically interconnected**, said first holding assembly **being configured to operate with** a first set of **functionalities** and said interface module **being configured to operate with** a main set of **functionalities**, said first communication device **being configured to operate with** a second set of **functionalities**, said main set of **functionalities** including said first set of **functionalities** and said second set of **functionalities**, said first set of **functionalities** being different from said second set of **functionalities** wherein one of the following exists: (i) all of said second set of **functionalities** not being **supported** by said first set of **functionalities** and (ii) all of said first set of **functionalities** not being supported by said second set of **functionalities**.

### Claim 9

A *method*, as claimed in claim 8, wherein:

at least when said first holding assembly is holding said first communication device, said interface module **supports functionalities** of said second set that are included in said first set while not **supporting functionalities** of said second set that are not included in said first set.

### Claim 10

A *method*, as claimed in claim 8, further including:

using a second holding assembly to hold said first communication device, with said second holding assembly being configured to operate with a third set of **functionalities** having more **functionalities** than said first set; and

**supporting** communications by said interface module between said second holding assembly and said interface module **including** supporting said third set of **functionalities**.

### Claim 21

A method, involving communications using a first communication device, a first holding assembly for holding said first communication device and an interface module, and with said first communication device, said first holding assembly and said interface module being electrically interconnected, said first holding assembly being configured to operate with a first set of **functionalities** and said interface module being configured to operate with a main set of **functionalities**, said first communication device being configured to operate with a second set of **functionalities**, said main set of **functionalities including** at least said first set of **functionalities** and said second set of **functionalities**, and with all of said first set of **functionalities** not being supported by second set of **functionalities** and **including** the step of supporting communications between said first holding assembly and said interface module by said interface module **including** supporting said first set of **functionalities**.

### B. Construction.

1. "providing"

Cellport proposes "utilizing," contending that that is the ordinary and customary meaning of the word. Peiker proposes "furnishing, supplying, or making available for use," citing Webster's Third New Int'l Dictionary 1827 (3d ed. 1986).

The words "providing," "provide," "provides" and "provided" are used repeatedly throughout the Specification. The plain and ordinary meaning of these words, whether to a lay person or to a person of ordinary skill in the art, is reasonably clear in context without the need for further construction. The Court finds, however, that the meaning is somewhat different, depending upon the context, and that the presumption that the same word in a patent ordinarily has the same meaning, *e.g., Phillips,* 415 F. 3d at 1314, does not apply.

For example, in the Abstract, the statement "Wireless communications . . . are provided" reasonably could be interpreted as meaning "Wireless communications . . . are utilized" or

"Wireless communications . . .  are furnished," but "utilized" fits the context better.  On the other hand, in the phrase, "it would be advantageous to provide an improved method and apparatus for providing a hands-free wireless communication device," Col. 2: 12-14, "furnish" and "furnishing" fit the context better.  In another example, "Accordingly, the pocket may provide for the passage of, e.g., radio frequency signals . . .," the term "provide for" means "allow" or "facilitate."

Although I am satisfied that the meaning of the various tenses of the word "provide" is reasonably clear in context without elaboration, the Court finds that, as used in Claim 8, the term "providing" means "utilizing."

2.   "electronically interconnected"

Cellport proposes "[a] connection between two devices that allows the transfer of electromagnetic signals or electrical power."  Col. 2: 45-52; col. 3: 29-31.  Peiker proposes "[p]hysical connection of electronic terminals or wireless connection so as to pass or transfer electrical signals without manipulating or changing their contents or substance (e.g., a hardwired connection or wireless connection via Bluetooth."  Figs. 4A-4B; Fig. 5; Col. 8: 14-26; Col. 9:55-col. 10:57; Col. 11: 14-17; Col. 12:28-62; Cited Prior Art Reference – Braitberg (5,535,274)/Col. 5: 28-42.

The Court has considered the parties' references.  The Court has found more than 35 instances throughout the Specification where the term or a similar term is used.  Peiker's proposal includes details of electric connections in various embodiments that unnecessarily and unreasonably limit the language of the claim.  I note that in its opening brief, Peiker acknowledges that "[t]he meaning of 'electrically interconnected' is relatively straightforward and not the subject of significant dispute between the parties.  Based on its plain meaning, and as

used throughout the Specification, 'electrically interconnected' simply means, in essence, a connection for passing an electric signal."  Opening Brief at 44-45.  That appears to be Cellport's point.

The Court construes the term "electrically connected" to mean "a connection between two devices that allows the transfer of electrical signals."

3.   "being configured to operate with"

Cellport proposes "[t]he parts are set up, designed, or arranged for the purpose of operating with," suggesting that this is the ordinary and customary meaning of the terms.  Peiker proposes "[i]ncludes processing hardware and software programmed to respond based on the content of the electronic signals and carry out or perform the 'functionalities.'"  Figs. 3, 4A, $B, 5, 6; Col. 7: 46-Col. 8:26; Col. 13: 12-15; Col. 14: 31-Col. 19: 10; Col. 23: 19-48.

The phrase is used three times in the claim.  The language in which it is imbedded is cumbersome, motivating counsel to attempt to explain it visually through colorful diagrams.  Joint Exhibits 9 through 11.

The relevant part of the claim states:

> said first holding assembly being configured to operate with a first set of **functionalities** and said interface module being configured to operate with a main set of **functionalities**, said first communication device being configured to operate with a second set of **functionalities**, said main set of **functionalities including** at least said first set of **functionalities** and said second set of **functionalities**, and with all of said first set of **functionalities** not being supported by second set of **functionalities.**

To understand the meaning of "being configured to operate with" as used in Claim 8, one must recall the overall nature of the invention.  Using the phone example, the system is designed to accommodate the multiple features available in modern mobile phones.  Those features depend upon the manufacturer, the age of the phone, the cost of the phone, and of course, the

desires and resources of the user.  The system described in this patent can be configured with different pockets and interface modules so that, depending on the capabilities of the phone and the capabilities built into the particular pocket and interface module selected, the user can add more and more features according to his needs, wants and budget.

The first holding assembly (the pocket) is designed and programmed to "support" (defined below) a set of "functionalities" (defined below) that the claim calls the "first set" of functionalities.  The interface module is designed and programmed to support a set of functionalities that the claim calls the "main set" of functionalities.  The first communication device (e.g., a mobile phone) is designed and programmed to support a set of functionalities that the claim calls the "second set" of functionalities.  The "main set" includes at least the "first set" and "second set" of functionalities, meaning that the interface module supports all the functionalities of the phone and the pocket and potentially additional functionalities.  However, while some functionalities of the phone must be supported by the pocket, not all of the functionalities supported by the phone are necessarily supported by the pocket.  However, all of the functionalities of the phone and the pocket, obviously including those supported by both the phone and the pocket, are supported by the interface module.

This is a complicated way of saying that, depending upon the features that one has in his phone and the capabilities that have been designed and programmed into whatever pocket the user is using, the interface module has been designed and programmed to accommodate the combination and enable the user to enjoy the features he desires and has been able to obtain.  The Court defines the term "being configured to operate with" to mean "being designed and programmed to support," which is substantially the same as Cellport's proposed construction and substantially the same as the suggestion in Peiker's opening brief that "when a device is

configured to operate with a set of functions, this means that the device is capable of carrying out or performing those functions."  Opening Brief at 49.

    4.  "functionalities"

Cellport proposes the simple definition "capabilities," citing Col. 3: 27-28 with several other "see also" citations.  Peiker proposes "capabilities of a communication device adaptable to 'hands free' use in a car environment."  Peiker cites Fig. 6; Col. 11:42-65; Col. 14:1 – Col. 24:24; Prosecution History – Amendment and Response dated October 2, 2001, pages 17 and 12.

In its opening brief, Peiker states that "[t]he parties agree that functionality is synonymous with "capability."  Opening Brief at 39.  However, it argues that Cellport's proposed definition is deficient because it encompasses capabilities unrelated to hands-free use of mobile communications in a vehicle.  *Id.* at 39-40.  During oral argument Peiker argued that substituting "capabilities" for "functionalities" merely substitutes one vague term for another.

I agree that the patent concerns hands-free use of a wireless communication device in a vehicle.  However, Peiker's proposed construction restricts "functionalities" to the wireless communication device, e.g., the mobile phone.  As discussed above, the wireless communication device, the pocket and the interface module each has its own set of functionalities.

The Court concludes from the language of Claim 8 and other claims and the ubiquitous use the term throughout the Specification that the term "functionalities" means the capability of the wireless communication device, the pocket, and the interface module to support features of the wireless communication device desired and purchased by the user.  All pockets and interface module combinations support hands free use of a wireless communication device in a vehicle.  However, to use the example of a mobile phone, a Level 1 Pocket is designed and programed so that the vehicle supplies electric power to the phone, recharges the phone's battery, and supports

a speaker phone feature.  These capabilities are the functionalities of the basic pocket.  A Level 2

Pocket supports additional functions.  Its functionalities include audible prompts, voice

commands, voice memo recording, and adaptability to different languages.  A Level 3 Pocket

adds storage of voice memos, directories and customized voice commands.  A Level 4 Pocket

adds text to speech conversion functionality.  Meanwhile, interface modules are designed and

programed with their own functionalities, which, as discussed above, include at least all of the

functionalities of a particular phone and pocket but, depending upon the phone and pocket in a

particular user's system, might include additional functionalities that neither the phone nor the

pocket supports.

     5.   <u>"support," "supported by," "functionalities not being supported by,"</u> etc.

     Cellport proposes that the various iterations of the word "support" be construed to mean

"facilitating, enabling, providing the capabilities for, or interfacing with a particular

functionality," arguing that that is the ordinary and customary meaning and requires no intrinsic

or extrinsic evidence.  Thus, a "functionality not being supported by" would mean "not

facilitating, enabling, providing the capabilities for, or interfacing with a particular functionality.

Peiker proposes "carries out" or "performs," or in the phrase "functionalities not being supported

by" the meaning would be "does not carry out or perform the 'functionalities.'"  Peiker cites Col.

12: 28-51; Col. 14:65 – Col. 16:10; Prosecution History – Amendment and Response dated

October 2, 2001, page 17.

     Cellport's opening brief persuasively demonstrates that "support" has somewhat different

meanings in different parts of the claims and the Specification.  In Claim 8, for example, the

phrase, "all of said second set of functionalities not being **supported** by said first set of

functionalities" means that the pocket's functionalities do not enable the user to use all of the

functionalities of the wireless communication device, e.g., the phone.  Likewise, "all of said first set of functionalities not being supported by said second set of functionalities" means that the functionalities of the phone do not enable the user to use all of the functionalities of the pocket. In Claim 9 the phrase ""said interface module **supports** functionalities of said second set that are included in said first set while not **supporting** functionalities of said second set that are not included in said first set" means that the interface module enables the user to use functionalities of the phone that are included in the functionalities of the pocket while not enabling the user to use functionalities of the phone that are not included in the pocket.

However, in Claim 10, a more sophisticated pocket ("second holding assembly") has been configured to have more functionalities ("a third set") than those of the basic pocket (the "first holding assembly").  This method is capable of "**supporting** communications by said interface module between said second holding assembly and said interface module including **supporting** said third set of functionalities."  In other words, the configuration is capable of enabling or facilitating communications between the phone and the interface module that enable the user to use the expanded "third set" of functionalities.

Peiker's proposal suggests that one set of functionalities "carries out or performs" a second set of functionalities.  I note that Col. 12: 28-51, cited by Peiker, does not contain the word "support" or any other tense of that verb.  "Support" and "supported by" do appear several times within Col. 14:65-Col. 16:10, also cited by Peiker.  The Court concludes that Cellport's proposal that "support" means to "facilitate, enable, provide the capability for or interface with" sufficiently and fairly covers the use of the term in that part of the Specification as well as elsewhere in the Specification and in the subject claims.  The Court further concludes that Peiker's proposed construction is not, strictly speaking, accurate.

Accordingly, while the two proposals are somewhat similar, the Court accepts and adopts Cellport's proposed construction.

"including"

Cellport proposes "contain as a subset," citing Col. 3: 57-61; Col. 5: 28-33.  Peiker proposes "supports all of the first set and the second set of functionalities," citing Figure 6; Col. 14:55 – Col. 19: 10; Col. 22:55 – Col. 23: 19; Prosecution History – Amendment and Response dated October 2, 2001, pages 16-17.

"Including" does mean "contains as a subset."  Perhaps only a patent lawyer can believe that such a definition would be helpful to a finder of fact pondering the meaning of the word. Peiker's proposed construction of the word "including" would puzzle any English speaker. Putting the term in context, however, the phrase "**including** supporting said third set of functionalities" in Claim 10 means that the more sophisticated pocket supports, among other things, the third set of functionalities.  In Claim 21 the phrase "said main set of functionalities **including** at least said first set of functionalities and said second set of functionalities" means that the interface module's functionalities support the functionalities of the pocket and the "first communication device" and perhaps other functionalities.

The other two uses of the word "including" in Claim 21 appear in what might be one long phrase.  The language is, "and with all of said first set of functionalities not being supported by said second set of functionalities and **including** the step of supporting communications between said first holding assembly and said interface module by said interface module **including** supporting said first set of functionalities."  The parties have not requested construction of the whole phrase, if it is a phrase, and perhaps I should feel fortunate.  Suffice it to say that the meaning of the word "including" is not mysterious.  **"[I]ncluding** the step of supporting

communications" means that at least the step of supporting communications is supported.

**"[I]ncluding** supporting said first set of functionalities" means that at least the functionalities for which the pocket was configured to operate is supported.

DATED this 6th day of February, 2012.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge