IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No.  09-cv-01007-RBJ-MJW

CELLPORT SYSTEMS, INC.,

      Plaintiff,

v.

PEIKER ACUSTIC GMBH & CO. KG,

      Defendant.

---

## ORDER and JUDGMENT

---

This case was tried to the Court on September 20-21, 24-25, 27-29, 2012 with final arguments given on November 29, 2012.

**Background**

Cellport Systems, Inc. ("Cellport"), a Colorado corporation, designs and develops technology that enables mobile phones to be connected to the audio, power and antenna systems of vehicles on a hands-free basis.  Peiker Acustic GMGH & Co.KG ("Peiker"), a German corporation, develops and sells hands-free components for mobile phones and hands-free car kits.

On October 1, 2004, in the midst of previous litigation between the parties and in part to settle that litigation, Cellport and Peiker entered into a license agreement" ("the Agreement"), admitted as Joint Trial Exhibit 45.  The Agreement allows Peiker to incorporate certain Cellport proprietary technology into "Licensed Products" in exchange for royalty payments based upon the total number of such products sold.

Cellport's technology enables mobile phones of various makes and models to be connected to the vehicle's audio and power systems through an interchangeable "pocket."  A pocket is designed to fit a specific phone.  As described in Cellport's United States Patent No. US 6,377,825 B1 ("the '825 patent), ex. 243, the pocket connects to an "interface module," which is affixed to the vehicle and has functionalities that support a variety of phones and pockets.  For example, several family members who each have a different mobile phone but use the same vehicle can use their phones on a hands-free basis in the vehicle by inserting the phone's matching pocket into the interface module.

Peiker manufactured pockets which it called "cradles."  Peiker paid royalties to Cellport on a specific pocket, called a "CKII cradle," that was paired with an interface module manufactured by Motorola and sold to Daimler-Chrysler AG.  This case arises from Peiker's refusal to pay royalties on seven other products: (1) CKII cradles sold to Daimler that were not paired with the Motorola interface module; (2) CKIV cradles that were sold to Daimler; (3) CKII cradles that connected to a Car Interface Box ("CIB") and were sold to Volkswagen, sometimes called a CKII/CIB system; (4) similar CKII/CIB systems that were sold to BMW; (5) a device called a "Bluetooth Peiker System Connector" or "BT-PSC" that was sold to Daimler; (6) Snap-in-Adaptors and Baseplates sold to BMW; and (7) CKVI cradles sold to Audi.

Cellport contends that each of the seven disputed products breached the Agreement either because they were "existing products" under paragraph 3.5 of the Agreement or because they were "Universal Mobile Connectivity Products" under paragraph 1.17(i) or 1.17(iii) of the Agreement.  I will refer again and again to these three alternative means of becoming a "Licensed Product" on which royalties are owed, so I will pause here to describe them in more detail.

Paragraph 3.5 of the Agreement identifies certain products that already existed when the Agreement was negotiated or that would be similar to such existing products that were deemed to be "Licensed Products" on which royalties would be owed.  Paragraph 3.5 provides:

> 3.5  Existing Products, etc.  Licensee acknowledges that
>
> (a) the cradle it is currently supplying to Daimler-Chrysler AG pursuant to a supply agreement with Motorola uses certain parts of the claims of the Licensed Patents and as such are (sic) Pockets;
>
> (b) [] the full systems it will supply to Volkswagen will use parts of the claims of the Licensed Patents and as such will be Universal Mobile Connectivity Products; and
>
> (c) the full systems it may sell, distribute or deliver, consisting of pocket adapters, docking plates and electronic box, comparable to then ALAC GmbH "Uniline" product, would be Universal Mobile Connectivity Products,
>
> and accordingly all of such foregoing products and components are, *and any substantially similar products and components* would be, Licensed Products, the manufacture, sale, distribution or delivery of which would infringe one or more claims of the Licensed Patents*, and that Royalties are due in respect of any manufacture, sale, distribution or delivery of said Licensed Products by Licensee.

Ex. 45 at 7 (emphasis added).

The product sold to Daimler that combined the CKII cradle and the Motorola interface module, on which Peiker has paid royalties, is the product described in paragraph 3.5(a).  The parties disagree as to whether the CKII/CIB system that Peiker sold to Volkswagen was the system described in paragraph 3.5(b); alternatively, Cellport contends that the CKII/CIB system was a "substantially similar" product.  Cellport contends that the CKII/CIB system sold to BMW and the CKIV cradles sold to Daimler were "substantially similar" products.  The parties agree that paragraph 3.5(c) does not apply to any product in this case.

Paragraph 1.17 defines "Universal Mobile Connectivity Products." These are products that might not have been identified as "existing" or "substantially similar" products in paragraph 3.5 but which nevertheless would be "Licensed Products." Paragraph 1.17 has three subparts, but the parties agree that subpart 1.17(ii) which concerned "Uniphones" has no application to this case. The relevant subparts, therefore, are 1.17(i) and 1.17(iii).

Paragraph 1.17(i) defines as "Universal Mobile Connectivity Products"

> (1) systems, devices or sets of components for using portable wireless devices in vehicles, (2) that work with more than one make of portable wireless device by substituting interchangeable Pockets that establish a physical, electrical and/or logical interface for the portable device to the remaining components of the system, and (3) consisting of a Pocket/Docking Station configuration, Pocket/Docking Plate/Docking Station configuration, or Pocket/Docking Plate/TCU configuration, *which the Parties acknowledge utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents*.

Ex. 41 at 4 (numbers and emphasis added)

In an earlier order, this Court interpreted the highlighted phrase in paragraph 1.17(i) as creating a rebuttable presumption that products that fit the three requirements of the paragraph utilize Cellport's patented technology. Order, February 6, 2012 [docket #201] at 11-12. The presumption can be rebutted by proof that the product does not use Cellport's patented technology. *Id.* Cellport contends that paragraph 1.17(i) applies to all seven disputed products. Peiker disagrees but does admit that paragraph 1.17(i) applies to the CKII/CIB systems sold to Volkswagen and BMW, subject to Peiker's right to attempt to rebut the presumption that those systems use Cellport's patented technology.

Paragraph 1.17(iii) is a catch-all provision that identifies certain products as "Universal Mobile Connectivity Products" even though they are not covered by paragraph 1.17(i). Paragraph 1.17(iii) covers

any other systems, devices or sets of components for using portable wireless devices in vehicles, or any one or more elements or components thereof, which utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents.

If a product is covered by paragraph 1.17(iii), then Cellport has the burden to prove that the product does use its patented technology. This contrasts with paragraph 3.5, which amounts to a stipulation that the product uses Cellport's patented technology, and paragraph 1.17(i), which puts the burden on Peiker to rebut the presumption that the product uses Cellport's patented technology. Cellport contends that paragraph 1.17(iii) need not be considered in this case, because all seven products are brought within the Agreement by one of the other two means. However, Cellport offers paragraph 1.17(iii) as providing yet another way that the Agreement covers the BMW Snap-in Adaptor and Baseplate. Peiker admits that the broad language of paragraph 1.17(iii) covers certain products not otherwise covered by the Agreement but contends that Cellport has not proved and cannot prove that the products use Cellport's patented technology.

During the trial I referred to the positions of the parties as "two ships passing in the night." Cellport views this as basically a contract case. Peiker sees it as basically a patent infringement case. In fact it is both, as the Court determined in its earlier orders interpreting disputed terms in the Agreement. *See* Orders of February 6, 2012 [#201] and July 6, 2012 [#219]. Therefore, as I review the evidence concerning each of the seven products, I will consider both the contract and the patent issues. As will be seen, I must also in some instances consider whether the parties' conduct compels a result even apart from the contract and patent issues.

Two other disputes concerning the patent side of the case emerged at trial. First, Cellport contends, apparently based on my prior orders, that royalties are owed if a product uses any part

of Cellport's patented technology, even if the product does not infringe a patent.  The phrase "utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents" is used in paragraph 1.17 of the Agreement.  I referred to that language in my prior orders.  However, it is fundamental, unless the parties clearly agree otherwise, that if a product does not infringe a patent, then the patent holder cannot demand royalties.  The inventor obtains a monopoly on his invention, i.e., on products that are covered by the patent, not on products that might have one but not all of the features of the patent.

Paragraphs 3.5(a) and (b) of the Agreement identify two specific products that are said to use "parts of the claims of the Licensed Patents," but which nevertheless are deemed to be "Licensed Products."  The meaning of "parts of the claims" is not clear on its face.  However, the facts concerning the two specific products seem to clarify the intended meaning.  In the Daimler/UHI product described in paragraph 3.5(a), a cradle manufactured by Peiker was combined with an interface module manufactured by Motorola.  The Peiker product did not, by itself, infringe a patent.  However, the combination of the cradle and the Motorola interface module formed a system that did infringe a patent.  The paragraph 3.5(b) product was never produced, as discussed later in this order; but it too was envisioned as combining a Peiker cradle with an interface module like the Motorola UHI.  At bottom, however, no matter how one reads the language of paragraphs 3.5(a) and (b), this Court holds that if a product does not utilize Cellport's patented technology, meaning by itself or in combination with another product infringe on a Cellport patent, then unless the parties expressly agreed otherwise, royalties are not due.

The second fundamental dispute is whether Peiker has to establish that the disputed products do not infringe any claim in all of the patents listed in the Agreement or only those

patents and claims that were identified by Cellport as being involved in this case.   In a

scheduling order issued by a magistrate judge early in this case [#61] Cellport was given a

deadline of February 12, 2010 to disclose its list of asserted patent claims.   Cellport complied by

filing "Plaintiff's List of Patent Claims."   Ex. 390.   In that document Cellport

> states that Peiker or its Subsidiaries have sold, distributed or delivered one or
> more system[s], device[s] or set[s] of components for using portable wireless
> devices in vehicles, or one or more element[s] or components thereof, which
> utilize technology, designs or architectures covered by one or more of the
> following claims of the Licensed Patents:
>
> 1. Claim 9 of United States Patent 6,341,218 entitled "Supporting and
>    Connecting a Portable Phone," issued December 6, 1999.
>
> 2. Claim 8, 9, 10 and 21 of United States Patent 6,377,825 entitled "Hands-Free
>    Wireless Communication in a Vehicle," issued April 23, 2002.
>
> 3. Claims 1, 2, 5, 6, 8, 9, and 12 of European Patent EP 1266456 entitled
>    "HANDS-FREE WIRELESS COMMUNICATION IN A VEHICLE."

That list defined the battleground of this case so far as the patent issues are concerned.

Each of the three patents listed has claims other than those listed by Cellport in exhibit 390.   For

example, U.S. Patent 6,341, 218 (the '218 patent) has 46 claims, only one of which (Claim 9)

was identified in Cellport's list of patent claims.   Moreover, Schedule A to the Agreement lists

several patents in addition to the three listed by Cellport.   However, one cannot reasonably

expect Peiker to disprove the application of patents or claims not listed.   The focus of the parties'

evidence and argument was on these specific claims.   The focus of the Court's earlier Markman

rulings was on disputed terms in the two listed United States patents.   The Court will confine its

patent analysis likewise to the patents and claims identified by Cellport as being in dispute.

With that background, it will be most useful if the Court makes its additional findings and

conclusions on a product by product basis, much the same as the way the parties presented their

evidence at trial.

**Findings and Conclusions**

A.  <u>**CKII's and CKIV's Sold to Daimler**</u>.

The CKII and CKIV cradles were substantially the same product.  Much of the evidence that drives my conclusions regarding CKII's sold to Daimler applies equally to CKIV's sold to Daimler.  I therefore will discuss these two products together.

1.  <u>CKII's</u>.

The present dispute can better be understood in an historical context.  Peiker's CKII cradle was developed between 2000 and 2001.  It supported mobile phones with a long list of functionalities as set forth in exhibit 22.  The CKII cradle was combined with a "Peiker System Connector" or "PSC" and a Universal Handy Interface or "UHI," manufactured by Motorola, in a system sold to Daimler.  The parties refer to this as the "CKII/PSC/UHI" or simply the "CKII/UHI" system.

Litigation developed between Cellport and Peiker concerning whether Peiker's sale of the CKII/PSC/UHI system to Daimler without paying royalties to Cellport was a breach of a previous contract.  The parties settled that case, and as indicated above, the Agreement that is involved in the present case was part of that settlement.  The parties stipulated in paragraph 3.5(a) of the Agreement that the CKII/PSC/UHI system was an "existing product" that was covered by the Agreement.  In the language of the Agreement, the CKII cradle is the "Pocket;" the PSC is a "Docking Plate;" and the UHI is a "Docking Station."

It is undisputed that Peiker has paid all royalties due on the CKII/PSC/UHI systems sold to Daimler.  However, Peiker did not do so "out of pocket."  Rather, with Daimler's knowledge

and approval, Peiker added the royalty to the price Daimler paid for the CKII and then passed the royalty through to Cellport.[1]

In 2007 Daimler began to replace the CKII/PSC/UHI system, at least in Mercedes C-Class vehicles, with a system that still used a CKII pocket but did not use the Motorola UHI interface module.  In a letter to Cellport's Chief Executive Officer Pat Kennedy dated October 17, 2007, Peiker's attorney Alexander Sennecke described this as a transition from the "Motorola System" to the "Mercedes System."  Ex. 122.  Sales of the "Mercedes System" caught up with and passed sales of the "Motorola System" 2008-2009 timeframe.  By 2010 Peiker's sales of the CKII/PSC/UHI system to Daimler had all but ended.

Despite the transition from the "Motorola System" to the "Mercedes System" the CKII cradle remained essentially the same.  However, Mr. Sennecke warned Mr. Kennedy that the royalty stream could end.  In his October 17, 2007 letter he said that Peiker would continue to pass through royalties received from Daimler and would use its best efforts to persuade Daimler to continue to remit royalty payments,

> but in the event that Mercedes decides to discontinue such payments Peiker will not pay Cellport any royalty.  The question whether a product replacing the Motorola System infringes a Cellport patent (i.e. whether Mercedes must pay a license fee to Cellport) is for Cellport to determine.

Ex. 122 at 3.

Mercedes did continue to pay royalties on the CKII, and Cellport continued to pass them through.  However, on February 4, 2010, approximately 11 months after this case was filed, Mr. Sennecke informed Cellport that Peiker had determined that its payment of royalties on CKII's sold to Daimler that did not pair with the Motorola UHI had been a mistake.  Ex. 177.  Mr. Sennecke indicated that Peiker would no longer make

---

[1] The royalty was $2.00 per unit sold.  However, Daimler paid $2.25 per unit.  Peiker retained the extra $.25 on each unit as an "administration fee."

the payments, and he demanded that Cellport repay the "overpayments." *Id.* The latter demand is the genesis of Peiker's Second Counterclaim found in the Second Amended Answer [#89] at 14.

Thus, Peiker drew a bright line: CKII's sold to Daimler generated royalties only when combined with the Motorola UHI. From Peiker's perspective, at least after February 4, 2010, the Motorola UHI is the only "interface module" with which the CKII has been paired; and therefore, it is the only CKII cradle that would have infringed a Cellport patent if it were not for the Agreement. Peiker states that it continued to pay royalties to Cellport on CKII cradles, despite Daimler's discontinuance of the Motorola UHI, only because it was on "autopilot."

This explanation is not credible. For one thing, Mr. Sennecke obviously understood that the UHI had been replaced in the "Mercedes System," but he promised to continue passing the royalties through and that Peiker would use its best efforts to persuade Daimler to continue paying them. It was not an accident that Peiker's payments continued.

I also note that as early as January 17, 2006, when Peiker was anticipating the introduction of a wireless connection between the CKII and a "MELCO HeadUnit," Lutz Richter, Peiker's Vice President for Product Strategy and Intellectual Property, wrote the following in an internal email:

> If the BT-PSC signifies the transition to the MELCO Head/Unit, licensing fees ($2) for the Cradles will continue to require payment in the future – no licenses are due for the BT-PSC.
>
> The problem is that the Bluetooth-Transmission Section can be viewed as completely transparent here – as a serial transmission between a Cradle and an Interface to the vehicle; this interface not only contains the control mechanism for the mobile telephone via serial interface, but also the speech-recognition, and, to a

large extent, it violates the awarded US-Patent – MELCO would have to pay $3.00 for the HeadUnit (Docking Station).

Ex. 96.[2]

MELCO is not Motorola, and its "HeadUnit" is not the Motorola UHI.  Yet, this email indicates that Peiker was not, at least in 2006, thinking that there had to be a Motorola UHI to trigger the royalty obligation.  I will return to this email when I discuss the Volkswagen products.

　　2.　CKIV's.

In 2008, while Peiker was still selling CKII cradles to Daimler either as part of the "Motorola System" or the "Mercedes System," Peiker began selling a new system to Daimler. The new system, at Daimler's insistence, used wireless technology.  It replaced the PSC with the Bluetooth PSC, and it created a Bluetooth connection from the Bluetooth PSC to the vehicle's head unit (a sophisticated apparatus located in the vehicle's dashboard that provides a hardware interface with the vehicle's electronic sound system).  In the new wireless configuration the CKII was renamed the CKIV.  This signaled the beginning of the end of the use of interface modules as had existed, for example, in the original CKII/PSC/UHI system.

Peiker received the same $2.25 per cradle royalty payment from Daimler on the CKIV's. However, Peiker neither informed Cellport of the change to the CKIV nor passed through the royalty payment.  In an email of July 24, 2008, Mr. Richter told Cellport that "we really pay license fees for every cradle delivered to Daimler."  Ex. 138.  That may or may not have been true at the time, depending upon whether deliveries of CKIV cradles to Daimler began before or after July 24.  It definitely was not true on a going forward basis.

---

[2] This document, like a number of others to which I will refer in this order, is labeled "Highly Confidential – Attorney's Eyes Only."  These "Attorney's Eyes Only" documents apparently were not produced in Peiker's initial disclosures or early production of documents.  According to Mr. Kennedy, he only saw them recently.

Although Peiker was not passing through the royalty money it was receiving from Daimler on the CKIV's, not everyone at Peiker seems to have felt that royalties were not owed on that cradle.  For example, on January 19, 2009 Michael Ewerts of Peiker sent a proposal to a Mr. Falter of Daimler regarding a "CKIV Blackberry 9000" product.  Ex. 153.  Mr. Ewerts specified that the price would include a Cellport license royalty of 1.56 euros, roughly the familiar $2.25 royalty.   This is another "Attorney's Eyes Only" document.  *See supra* note 2.

Nor did Peiker tell Daimler what it was doing at the time.  In March 2011, after Daimler had become aware of the litigation between Peiker and Cellport, it requested confirmation that its payments had in fact been transmitted to Cellport.  Ex. 193.  Peiker responded on October 7, 2011 that certain amounts had not been forwarded and had been set aside in a separate account.  Ex. 194.  Peiker similarly took the position at trial that it has placed funds paid by Daimler but not passed through to Cellport in a "suspense account," and that it would transfer those funds to Daimler or Cellport according to the Court's resolution of this case.  Cellport notes that it has never been furnished with any documentation of the suspense account or its contents.  Likewise, the Court has no documentary evidence as to when Peiker began to segregate Daimler's payments into a "suspense account," other than what Peiker told Daimler on October 7, 2011.  What is reasonably clear, however, is that if Peiker believed that it had no obligation to pay royalties to Cellport on CKIV cradles, it should have notified Cellport and Daimler when that product first was sold.

3.   Peiker's Position.

As indicated, Peiker now takes the position that it only owes royalties on sales of CKII cradles that were combined with the Motorola UHI.  It does not dispute that the CKII's used in the so-called "Mercedes System" or the CKIV's used in the Bluetooth

system would be covered at least by paragraph 1.17(iii) of the Agreement if they utilized Cellport's patented technology.  However, according to Peiker, they do not use such technology, because as used in the other systems, the cradles were not combined with an interface module that had a "main set of functionalities."

This concept is central to Peiker's position on the '825 patent, which is the primary patent applicable to each of the disputed products in this case except the Snap-in-Adapter/Baseplate sold to BMW and the CKVI cradle sold to Audi.  Claim 8 of the '825 patent describes a system in which the pocket has a set of "functionalities." "Functionalities" are essentially the same as "capabilities."[3]  In Claim 8, the pocket's functionalities are referred to as the "first set of functionalities."  The phone's functionalities are called the "second set of functionalities."  The interface module has a set of functionalities called the "main set of functionalities."  The functionalities of the pocket do not support all the functionalities of the phone; the functionalities of the phone do not support all of the functionalities of the pocket; but the "main set of functionalities" of the interface module supports all functionalities of both the pocket and the phone. Claims 9, 10 and 21 are variations on this theme.  The relationship of the pocket's and the phone's functionalities to each other varies, but the "main set of functionalities" in the interface module always supports at least the functionalities shared by the pocket and the phone.

Peiker's position on the '825 patent was explained colorfully in counsel's opening statement.  In the system that combines the CKII cradle with the Motorola UHI, the CKII (pocket) has a set of functionalities that counsel analogized to a "little brain."  The phone

---

[3] In its Markman order the Court defined "functionalities" to mean "the capability of the wireless communication device, the pocket, and the interface module to support features of the wireless communication device desired and purchased by the user."  Order, February 6, 2012 [#201] at 29.

has a set of functionalities that could be thought of as another "little brain." The UHI, which is the interface module in that system, has a larger or "main" set of functionalities which counsel labeled the "big brain." The "big brain" supports all of functionalities of whatever cradle/phone combination is connected to it. Unlike the "little brains," the interface module or "big brain" is affixed to the vehicle.

I will return to the little brain, big brain concept when I discuss the Volkwagen CKII/CIB and BMW CKII/CIB systems. However, for the reasons set forth immediately below, I conclude that I need not discuss it further with respect to the disputed CKII and CKIV cradles sold to Daimler.

4.   Conclusion.

Reinhard Kromer, currently Peiker's Chief Operating Officer, was a member of the Peiker team that negotiated the Agreement. He testified that while Peiker was having discussions with Cellport it was also having discussions with Daimler. Tr. at 1136. As we know, Daimler agreed to add a license fee for Cellport to the price of the CKII cradle that Daimler was purchasing at that time. *See* Ex. 50. Mr. Kromer testified that Peiker's willingness to enter into the Agreement was based upon or at least influenced by Daimler's willingness to fund Peiker's royalty obligation to Cellport. Tr. at 1138. This is a common theme that we will see again. So long as someone else is providing the money, Peiker is willing to pay the royalty. One has to wonder whether Peiker thought it actually owed a royalty on even the "Motorola System," or whether, instead, it agreed to it because it was "free."

It is not surprising that Peiker's original agreement with Daimler only referenced the CKII/PSC/UHI system. That was the system that existed at that time. However, Daimler paid and Peiker accepted the same $2.25 payment on the so-called "Mercedes System;" and, until

disputes later broke out, passed $2.00 through to Cellport.  There is no reasonable way to explain

that fact if Peiker did not accept that it owed royalties on that product to Cellport.  Peiker

accepted, but astonishingly did not pass through, the same payments on sales of CKIV's.  There

is no principled way to explain this.  As indicated, Peiker's attempt now to explain these things

as the result of its having unthinkingly received those payments from Daimler because it was on

"autopilot" is simply not credible.  Nor is it consistent with the comments of Mr. Richter in

exhibit 96 or Mr. Ewerts in exhibit 153.

     The Court concludes that Peiker's conduct binds it to pay royalties on all CKII and CKIV

products sold to Daimler.  To this extent its hands are not clean.  By its conduct it has waived,

and is estopped from asserting, any claim of entitlement to repayment of the royalties that were

paid by Daimler on CKII cradles and passed through to Cellport.  For the same reasons the Court

concludes that Peiker has waived, and must be estopped from asserting, any claim of entitlement

to retain the monies that it collected from Daimler on CKIV units but did not pass through to

Cellport.  This includes but is not necessarily limited to all funds that allegedly are being held in

a "suspense account."

    **B.  <u>CKII/CIB (Volkswagen).</u>**

    1.  <u>What This Product Is (and is not).</u>

    The Agreement contemplated that each year the parties would meet and Peiker would

disclose any products that it sold during the prior calendar year that might reasonably be

considered to be Licensed Products.  Ex. 45, ¶3.6.  The first such meeting was held on November

16, 2004.  The parties discussed three products that Peiker either expected to sell or was already

selling to Volkswagen.  The minutes summarized the discussion as follows:

**VW USA-CKII-CIB Box**

According to current statements by VW, Peiker is expecting that deliveries to the USA will commence in the second quarter of 2005.  This will be a new, universal hands free device that will be subject to license in accordance with the new agreement."

**VW Europe-Fixed Installation (Single Handy Hands free Solution)**

Product was presented.  It is not subject to license

**Universal Hands free Device CKII/CIB UHV-Box**

A model of the product was demonstrated.  VW refuses to pay royalties due to a lack of EU patents issued.  Cellport is striving to come to an understanding with Volkswagen/Votex through direct talks, and Peiker wills be kept up to date. Peiker is willing to do what it can to support Cellport in its negotiations with VW/Votex.

Ex. 47 at 1-2 (emphasis in original).

It is undisputed that between 2004 and 2006 Peiker sold numerous CKII cradles and Car Interface Boxes or "CIB's" to Volkswagen.  These sales tailed off after 2006 and were essentially done, except for a few replacement cradles, after 2008.  It is also undisputed that Peiker has not paid royalties on either the CKII's or the CIB's sold to Volkswagen.  The parties dispute what part of the Agreement applies to these products, collectively referred to as the CKII/CIB system, and whether they utilize Cellport's patented technology.

Cellport argues that the CKII/CIB system is what was described in paragraph 3.5(b) of the Agreement.  If so, then the Agreement stipulates that it is a Licensed Product as to which royalties are due.  Peiker argues that paragraph 3.5(b) referred to the first of the three products discussed at the November 16, 2004 meeting –a product that it expected to sell to Volkswagen for the U.S. market but never did.  According to Peiker, the CKII/CIB system was the third

product listed in the November 16, 2004 minutes – a product that Peiker had been selling to Volkswagen since 2003.  The evidence supports Peiker's position.

In paragraph 3.5(b) of the Agreement Peiker acknowledged "that the full system *it will supply* to Volkswagen will use parts of the claims of the Licensed Patents and as such will be Universal Mobile Connectivity Products."  Ex. 45 ¶3.5 (b)(emphasis added).  In a draft of the Agreement, paragraph 3.5(b) described this as a product Peiker "expects to supply to Volkswagen."  Ex. 44 at 14.  Notwithstanding that paragraph 3.5 is headed "Existing Products, etc.," the wording of paragraph 3.5(b) is consistent with a product not yet being supplied to Volkswagen.

According to Mr. Richter, Volkswagen cancelled its purchase of that system before any sales were made.  Trial Transcript ("Tr.") at 1014.  In an April 26, 2005 letter to Cellport Mr. Sennecke confirmed that Peiker had not shipped any "cradles/UHI units" to Volkswagen designated for the U.S. market.  Ex. 59 (misdated April 26, 2004) at 3.[4]  In a June 24, 2005 letter Mr. Sennecke again confirmed that, "[c]ontrary to Peiker's expectations, it has not shipped any cradles/UHI units to VW designated for the U.S. market."  Ex. 65 at 3.  There was no contrary evidence.

Accordingly, the Court finds that the system described in paragraph 3.5(b) of the Agreement is not the CKII/CIB system sold to Volkswagen.  That system was never sold.  Rather, the CKII/CIB system is the third product identified in the November 16, 2004 minutes.  That product was first sold to Volkswagen in 2003.  Nevertheless, Cellport argues, alternatively, that the CKII/CIB system is covered by other parts of the Agreement.  Before turning to that

---

[4] The evidence did not clarify whether Mr. Sennecke's reference to "UHI units" indicated that a Motorola UHI was to be used in this product.

contention, it is revealing to observe the parties' conduct following the November 16, 2004 meeting.

      2.  <u>The Parties' Conduct, 2004-2010</u>.

As indicated above, the minutes of the November 16, 2004 meeting indicated that Volkswagen was refusing to pay royalties on the CKII/CIB system; that Cellport was talking directly with Volkswagen about this and would keep Peiker up to date; and that Peiker would "do what it can to support Cellport in its negotiations with VW/Votex." Ex. 47 at 2. On December 8, 2004, Mr. Quartner, commenting on the November 16, 2004 minutes, advised Mr. Sennecke that "[n]othing in our meeting with VW changed our opinion that Peiker will owe royalties on the pocket/docking stations it provides to VW. Ex. 56 at 4. However, Cellport did not press the issue. Mr. Kennedy testified that this was because he was trying to work with Peiker.

Meanwhile, Peiker had also had communications with Volkswagen about a royalty for Cellport, apparently without success. *See* ex. 49 at 5. In Mr. Sennecke's April 26, 2005 letter he reported that Volkswagen would not agree to pay a royalty on the CKII/CIB product being used in its European market. Ex. 59 at 3. He noted that Cellport had indicated that it would meet with Volkswagen and report back to Peiker, but that Peiker had not received a report from Cellport as yet. *Id.* In his follow-up letter of June 24, 2005 letter Mr. Sennecke advised Mr. Quartner that because of Volkswagen's position and because Cellport still had not updated Peiker on whether Volkswagen had agreed to become a Cellport licensee, "Peiker now regards its supply of product to VW outside the scope of its license agreement with Cellport." Ex. 65 at 3.

The parties met four days later, on June 28, 2005, for Peiker's annual presentation of products that might be covered by the Agreement. According to the minutes, Cellport did not

demand that Peiker pay royalties on the CKII/CIB system.  Rather, Mr. Kennedy said that he was surprised by Peiker's report that Volkswagen refused to pay license fees, because he had had what he thought had been a good meeting with Volkswagen in November.  Based on Peiker's report, Cellport was considering a suit against Volkswagen.  Ex. 67 at 1.

On September 27, 2005 Mr. Quartner stated that Mr. Sennecke was aware that Cellport does not agree that Volkswagen's refusal to pay royalties absolved Peiker of its obligation.  Ex. 82 at 1.  Mr. Sennecke responded that Peiker would like to work with Cellport to determine how best to convince Volkswagen that royalties are due.  Ex. 85 at 3.  Mr. Quartner replied "[p]erhaps the best thing for us to do would be to take a look at the VW product again since it has been some time." *Id.* at 1.  He requested that Peiker provide a sample of the product and indicated that Cellport would then be in a better position to discuss the matter.  *Id.*  Peiker provided a technical explanation of the product and a sample for examination in late October 2005.  Ex. 88.

Peiker heard nothing further.  The parties' 2006 annual meeting was held on March 23, 2006.  The CKII/CIB system was not mentioned.  *See* Ex. 102.  The CKII/CIB system was not mentioned in Mr. Kennedy's first "demand" letter, dated June 12, 2008, in which Mr. Kennedy asserted that Peiker might not be complying with its royalty obligations under the Agreement.  Ex. 131.  Likewise, the CKII/CIB system was not mentioned in Mr. Kennedy's second demand letter, dated July 10, 2008.  Ex. 137.  It was not identified as an accused product in interrogatory answers filed in this case in November 2009 and again in March 2010.

It was not until Cellport submitted supplemental interrogatory answers on September 21, 2010 that the CKII/CIB system was identified as an accused product.  *See* Ex. 215.  By that time, nearly five years after Peiker had sent Cellport a sample and technical explanation of the product at Cellport's request, the product was essentially no longer being sold.

3.   The Parties' Positions Now.

As indicated above, as an alternative to its paragraph 3.5(b) theory, which the Court has now rejected, Cellport argues that this product is covered either as a "substantially similar" product under paragraph 3.5 or as a "Universal Mobile Connectivity Product" under paragraph 1.17(i) of the Agreement.  I do not agree that the CKII/CIB system is "substantially similar" to either the CKII/UHI (Daimler) system identified in paragraph 3.5(a) or to the system contemplated for Volkswagen's U.S. market per paragraph 3.5(b).  The CKII cradle in both of those systems either had or would have had an interface module that had a "main set of functionalities."  The CKII/CIB system did not.  I note that in none of Mr. Quartner's communications to Mr. Sennecke did he suggest that paragraph 3.5 of the Agreement covered the CKII/CIB system, either under paragraph 3.5(b) or as a "substantially similar" product.  That would have been an obvious argument if he thought paragraph 3.5 applied, as it would have eliminated any further debate as to whether the product used Cellport's patented technology.

However, Peiker concedes and I agree that paragraph 1.17(i) applies.  The CKII is the "Pocket," and the CIB is the "Docking Station" under the broad definitions of those terms in the Agreement.  Accordingly, per this Court's previous order, the Agreement establishes a rebuttable presumption that the CKII/CIB system uses Cellport's patented technology.  Peiker argues that the evidence rebuts the presumption.  The patents in question are the '825 and the '456 patents.  Neither party suggests that the '218 patent, which concerns a latching mechanism, has potential application to the CKII/CIB system.

4.   Conclusions –the '825 Patent.

The systems described in Claims 8, 9, 10 and 21 of the '825 patent each has a phone with a set of functionalities; a holding device (pocket) with a set of functionalities; and an interface

module with a set of functionalities.  The interface module supports at least the functionalities that are common to the pocket and phone.  I referred earlier to Peiker's analogy to a "big brain" (the interface module) that supports the functionalities of the "little brains," the pocket and the phone.

Peiker argues that the CIB is not an interface module within the meaning of Cellport's '825 patent.  The CIB does not support all the functionalities of the pocket, e.g., the functionalities listed in ex. 22.  Rather, according to Cellport's expert Dr. Perkins, the CIB functions as a translator of data sent by the cradle to the CAN network, which in turn controls basic vehicle electronics but not the head unit and audio system.  It does not change the content of the data. Tr. at 695-98.  Mr. Perkins was not familiar with all the functionalities supported by the UHI interface module.  However, when he was asked about several of the functionalities listed in Ex. 22, he acknowledged that the CIB did not support them.  *Id.* at 698-700.  He admitted that he could not identify any Peiker product that had a "main set of functionalities" as that specific term was used in the independent claims, Claims 8 and 21, of the '825 patent.  *Id.* at 702.  Likewise, Mr. Richter testified that the CIB had limited functions.  Tr. at 1020.

Dr. Perkins did point out a statement in what appears to be a Peiker PowerPoint slide: "The Intelligence of a hands-free solution can be placed within an external Car Interface Box (CIB) built into the vehicle."  Ex. 272.  He speculated that "intelligence" as used there means that the CIB "plays a leading role or perhaps the leading role in controlling the system."  Tr. at 596.  No Peiker witness was asked about this slide, nor was it mentioned by either counsel in closing arguments.  However, Dr. Perkins' speculation about what the word "intelligence" in the slide meant was contrary to his own opinion regarding the limited function of the CIB.  I am not sure what to make of the slide, which appears to have been a promotional document of some

kind, but it certainly does not convince me that the CIB in the Volkswagen system had a "main set of functionalities," or that it was an "interface module" within the meaning of the '825 patent.

I also note testimony given by Andreas Froidl, an engineer employed by Peiker, in a deposition taken in Germany on September 24, 2010.  Mr. Froidl testified that he did not know whether the CKII cradle made for the Volkswagen system had "a telephone side and another side comparable to the UHI side in the Mercedes system."  Depo. at 61-62.  However, he answered "yes" to a question whether the CKII for the BMW system "utilizes a processor that has both a phone side and another side similar to the UHI side," although he did not know the name of the device that performed functions similar to the UHI.  *Id.* at 59-60.  If the BMW system to which he was referring was the CKII/CIB system sold to BMW, and the free-speaking device to which he was referring was the CIB, then the inference would be that he believed that the CIB in that system had similar functions to the UHI in the Daimler system.  From that one could infer that the CIB in the Volkswagen system functioned like the UHI, because the parties acknowledge that the CKII/CIB systems sold to Volkswagen and BMW were similar.  It is not clear how much Mr. Froidl actually knew about the function of the CIB.  However, the testimony of Dr. Perkins at trial established to my satisfaction that the CIB did not have the functionalities of the UHI, nor could it be said to have a "main set of functionalities" as contemplated by the '825 patent.

Finally, I considered whether something else in the Volkswagen system – the head unit, for example – might be the equivalent of an interface module that could bring this system within the '825 patent.  I refer again to Mr. Richter's "attorneys' eyes only" email of January 17, 2006, subject "cellport-DC Mercedes license."  Ex. 96.  In that email Mr. Richter said that if the BT-PSC signified the transition to the "MELCO HeadUnit," royalties would still be owed on cradles sold to Daimler but not on the BT-PSC.  He suggested that MELCO would have to pay a $3.00

royalty "for the HeadUnit (Docking Station)."  The inference is that, at least in that Daimler system, the combination of the CKII and the MELCO head unit utilized Cellport's patented technology.

This made me wonder whether the head unit in Volkswagen vehicles that used a CKII/CIB system could be viewed as an interface module with a main set of functionalities.  However, no evidence was presented about the Volkswagen head unit.  No one on Cellport's side argued that the head unit in Volkswagen vehicles that used a CKII/CIB system amounted to an interface module or had a main set of functionalities.  The MELCO system was mentioned in the Richter email only in connection with the CKII and CKIV sold to Daimler.  Mr. Richter was not asked to describe the MELCO system or to explain why he believed it would generate a royalty obligation.  Mr. Kennedy did contact manufacturers who supplied head units to Daimler in an effort to understand their systems and see if there might be a license fee owed, but they were apparently unwilling to share their specifications with him.  Tr. at 435-36.  *See also* Kennedy deposition, October 21, 2010 at 40-42.  Those efforts intrigued me a little, but I cannot draw conclusions from them concerning the head units in Volkswagen vehicles.

To return once again to the "big brain, little brain" analogy, Cellport did not clearly identify a "big brain" in the CKII/CIB system sold to Volkswagen.  In other words, Cellport did not identify an interface module having a "main set of functionalities" in that system.  This perhaps reflected Cellport's concentration on the Agreement as opposed to the patent, or the fact that Cellport did not have the burden of proof.  However, the Court was left with Peiker's argument, built primarily on Dr. Perkins' testimony, that there was no "big brain" in the CKII/CIB system.  Peiker's counsel argued that the CKII/CIB system sold to Volkswagen was

more primitive than Cellport's invention.  I found it hard to dismiss that argument based on the evidence presented.

In summary, three things stand out.  First, there was no evidence that there was a "big brain" in the CKII/CIB system; Peiker's evidence suggested that there was none.  Second, after requesting and receiving a CKII/CIB system and a technical description of that system in October 2005, Cellport did not again suggest that royalties were due until nearly five years later, well after this litigation was underway; this supports an inference that Cellport, which is a technologically savvy company, believed that royalties were not due on this product.  Finally, Cellport's expert Dr. Perkins did not do an infringement analysis on this product, or any other disputed product, even though he was apparently capable of doing so.  It comes back to the two ships passing in the night.  I have to take the evidence as it is.

The Court concludes that Peiker did establish, to a preponderance of the evidence, that the CKII/CIB system sold to Volkswagen did not practice Cellport's '825 patent.  As I reviewed the evidence and arguments, I found this to be the hardest call I had to make in this case.

5.  Conclusions – the '456 Patent.

This patent, a copy of which was admitted as exhibit 247, has been characterized as, more or less, the European counterpart to the '825 patent.  It has been revoked by the European patent office.  However, the revocation is on appeal, so it technically remains in the case.  Compared to the '835 patent it received little attention during the trial.  It was not mentioned by any witness in the context of the CKII/CIB system sold to Volkswagen.

Cellport has identified seven claims, two of which are independent claims (1 and 9).  The others (2, 5, 6, 8 and 12) are dependent claims.  Both Claims 1 and 9 require that there be an interface module that performs signal processing functions.  Examples of such functions are echo

cancellation, frequency equalization and noise reduction.  Dr. Perkins acknowledged that the CIB in the Volkswagen system did not perform such functions.  Tr. at 699-700.  There was no evidence that it did.

Peiker had other arguments as to why the CIB did not perform functions required of the interface module in the '456 patent, but I need not reach them.  Because the CIB does not perform signal processing functions, I conclude that the CKII/CIB system sold to Volkswagen does not infringe the independent claims of the '456 patent.  For that reason it likewise does not infringe the dependent claims.

### C.  CKII/CIB (BMW).

This product was presented in the parties' annual meeting held on March 23, 2006.  The minutes indicate that "[a] detailed description of the Peiker CKII sold to BMW . . . is attached hereto."  Ex. 102 at 1, 3.  Mr. Richter's report concluded that the product was not covered by the license agreement, and that no license fee was payable."  *Id.*  Cellport did not dispute this.  This product was not identified as an accused product until supplemental interrogatory answers filed on November 18, 2010.  Ex. 217.

The key fact here is that the parties agree that the product is substantially similar to the product sold to Volkswagen.  It makes no sense to rule one way on the Volkswagen product and another on the BMW product.

### D.  BT-PSC (Daimler).

As mentioned earlier, the Peiker cradle initially connected through the Peiker System Connector or "PSC" to, for example, the UHI interface module.  The PSC was a hardwired baseplate.  Cellport has never claimed that Peiker owed royalties on the PSC.  Peiker began converting to a wireless connector, called the Bluetooth Peiker System Connector or "BT-PSC,"

in 2005.  According to Exhibit 363, a small fraction of the connectors used in the Daimler products in 2005 and 2006 used BT-PSC's.  The percentage of the units that used the BT-PSC increased to about 12% in 2007, nearly 50% in 2008, and the great majority beginning in 2009.  This reflects that Bluetooth was a significant technological advance, and Daimler insisted upon it.

    1.  <u>The Parties' Positions</u>.

Peiker presented the BT-PSC at the March 23, 2006 annual meeting.  Mr. Richter stated that the BT-PSC was not covered by the Agreement.  Ex. 102 at 1.  Cellport did not dispute this at the time.

However, Mr. Kennedy began hearing that the BT-PSC might have replaced the Motorola UHI.  Eventually he hired a consultant named Axel Fuchs to investigate the matter.  Cellport sent Mr. Fuchs to Germany but, according to Mr. Kennedy, Peiker wouldn't meet with him.  Mr. Fuchs never was able to develop an opinion.

In 2008 Cellport hired Ralph Poplawsky, one of the inventors on the '825, '456 and '218 patents, to assist in analyzing the BT-PSC.  Ultimately the BT-PSC became one of the accused products in this case.  Mr. Kennedy defends Cellport's delay in challenging the BT-PSC on the basis that he believes that Mr. Richter did not fully disclose what the product was or what it did in the March 2006 meeting, and that Peiker obstructed Cellport's efforts to investigate the product during the following two years.

Cellport now argues that, unlike the PSC, the BT-PSC is a processor, and therefore, it is a "Docking Station," not a "Docking Plate."  As such, the combination of a cradle with the BT-PSC meets the definition of a "Universal Mobile Connectivity Product" in paragraph 1.17(i) of

the Agreement.  That would create a rebuttable presumption that the product utilizes Cellport's

patented technology and would put the burden on Peiker to prove that it does not.

Peiker acknowledges that the BT-PSC has processing capability.  However, it claims, this

is only such processing as is necessary for the BT-PSC to provide a wireless connection.  Peiker

argues that the BT-PSC, like the PSC, is a "Docking Plate."  A "Pocket/Docking Plate"

configuration does not trigger paragraph 1.17(i).  Peiker argues that the only way the BT-PSC

could be brought under the agreement is if it could be fit under paragraph 1.17(iii).  Under

paragraph 1.17(iii) Cellport has the burden to prove that the product does utilize its patented

technology.

2.  The Agreement.

The Agreement's definitions are not particularly enlightening.  A "Docking Plate" is a

device that holds a pocket and "establish[es] *connectivity* between the portable wireless device

held by such Pocket and vehicle resources such as power, audio, antenna and/or other vehicle

electronics, either directly or through a Docking Station."  Agreement, ex. 45, paragraph 1.4

(emphasis added).  A "Docking Station" is a device that "*interfaces* with vehicle resources such

as power, audio, antenna and/or other vehicle electronics, either directly or otherwise, for

example, by connecting to a vehicle bus, and also interfaces, either directly or through a Docking

Plate, with a Pocket."  *Id.* paragraph 1.5 (emphasis added).  Thus, a "Docking Plate" establishes

"connectivity," while a "Docking Station" "interfaces."  Those terms are not defined.

I take this dispute in two parts.  First, the evidence supports Peiker's position that the BT-

PSC's processing capability is only that which is necessary to provide a wireless or Bluetooth

connection.  It translates signals received from the phone through the cradle into Bluetooth

"language" so that they can be communicated wirelessly to the head unit.  It provides analog to

digital conversion, power conditioning (for itself, not the cradle), and a wake-up feature.  Jeff

Golden, an expert in Bluetooth technology, took a BT-PSC apart and confirmed that there is

nothing in it that is not needed for it to provide Bluetooth functionality.

That being the case, I find that the BT-PSC creates a connection to the cradle or pocket.

It is simply a more modern version of the PSC.  As Dr. Perkins acknowledged, the fact that a

hard wired connection was replaced with a wireless connection did not make a difference in the

functionality of the system.  Tr. at 667.  The cradle does not know whether it is connecting

through a PSC or a BT-PSC.  *Id.* at 668.  Because the BT-PSC does not provide functionalities

for the hands free operation of a phone, I find that it does not "interface" with vehicle resources.

Rather, it provides connectivity to vehicle resources.  Therefore, it is a "Docking Plate," not a

"Docking Station."

Therefore, the BT-PSC is not a "Universal Mobile Connectivity Product" within the

meaning of paragraph 1.17(i) of the Agreement.  Paragraph 1.17(iii) is very broad, covering "any

other systems, devices or sets of components for using portable wireless devices in vehicles" that

utilize Cellport's patented technology.  The BT-PSC, broadly speaking, is a device for using

portable wireless devices in vehicles.  In that sense the PSC could also have been viewed as a

device for using portable wireless devices in vehicles.  Yet, royalties have never been claimed on

the PSC.  Nevertheless, for the sake of completeness, I will turn to whether the BT-PSC utilizes

Cellport's patented technology.  The potentially applicable patents are the '825 and '456 patents.

The '218 patent, concerning a latching mechanism, is not relevant to this product.

3.  Conclusions – the '825 Patent.

As discussed earlier in this order, the relevant claims in the '825 patent describe a method

whereby a pocket with a "first set of functionalities" receives a phone with a "second set of

functionalities" and then connects with an interface module that has a "main set of functionalities. The BT-PSC has functionalities, to be sure. However, as Mr. Golden indicated, those functionalities simply enable it to provide the wireless connection that the PSC provide through hard wires. The BT-PSC does not have a "main set of functionalities" as was contemplated by the invention. It is not an interface module within the meaning of the '825 patent. It is simply a different transport mechanism than the hardwired transport. It does not practice the '825 patent.

4.   Conclusions – the '456 Patent.

The BT-PSC does not perform audio signal processing, i.e., "signal processing functions" such as echo cancellation, frequency equalization and noise reduction. This was specifically and credibly addressed by Mr. Golden. Tr. at 759-61. It does not practice the '456 patent.

**E.   Snap-in Adaptor/Baseplate (BMW).**

This product consists of a Snap-in-Adaptor, into which a phone sits, and a Baseplate that is largely inert. Snap-in Adaptors and Baseplates were sold to BMW beginning in 2004. Initially the Baseplates and some Snap-in-Adaptors were produced by an unrelated company, Funkwerk Dabendorf. In 2007, after Dabendorf experienced financial difficulties, Peiker took over the production of the Baseplates as well as the Snap-in-Adapters.

1.   The Parties' Evolving Positions.

Peiker initially presented this product during its November 16, 2004 meeting with Cellport. The minutes state,

**BMW – Snap-in Adaptor**

Peiker explained that the base plate will be provided by Funkwerk Dabendorf, and the hand snap-in adaptor partly by Dabendorf, and partly by PA. The existing Cellport/Peiker License Agreement is to be amended to include a stipulation that as of October 1, 2004, *Peiker is willing to pay a royalty per unit of 1 US$ for*

shipments to the U.S. for its BMW USA deliveries, i.e., the handy snap-in adaptor.  Cellport will make the final decisions with regard to the handling of this matter, within the context of its license negotiations with Funkwerk Dabendorf.

. . .

**Latching Mechanism**

Peiker acknowledges in principle the validity of US Patent Us 6,341,218 B1; note: Snap-in-Adaptor BMW serves as an example."

Ex. 42 at 2, 3 (emphasis added).

Mr. Richter's explanation at trial was that Peiker did not believe the Snap-in-Adaptor was a "Universal Mobile Connectivity Product," but it did believe it used patented Cellport technology because of one claim (Claim 37) of the '218 patent.  Tr. at 992.  However, the Snap-in-Adapter and the Baseplate are relatively inexpensive products.  Peiker did not believe that they could economically support the full royalty. Peiker proposed a compromise at $1.00 for the Snap-in-Adapter.

Cellport did not accept or reject the $1.00 offer.  The November 16, 2004 minutes indicate that Cellport would make its decision "within the context of its license negotiations with Funkwerk Dabendorf."  Ex. 47 at 2.  Although not mentioned in the minutes, Mr. Kennedy apparently also indicated that that he planned to meet with BMW to discuss the royalty issue.

In a December 8, 2004 letter Mr. Sennecke stated that "Pat's comments regarding a future meeting with BMW left the issue of a royalty payment in connection with Peiker's snap in adaptor component open and his comments regarding Cellport's licensing effort with Funkenwerk (sic) Dabendorf provided no clear resolution."  Ex. 56 at 4.  Mr. Quartner responded, "[w]e were expecting a sample of the product which we have not received."  *Id.*

Cellport struck out in its efforts to convince BMW.  On July 31, 2005 BMW advised Cellport that it did not believe that Claim 37 of the '218 patent applied to the product.  Ex. 76.  It described the other claims of the '218 patent as "less critical."  *Id.*

Cellport seems to have agreed.  In an email from Mr. Quartner to Mr. Sennecke dated August 16, 2005, summarizing their telephone call of the same date, Mr. Quartner stated, "As to BMW, I agreed that the sale by Peiker to Dabendorf of the mounting plate [the Snap-in-Adaptor] does not raise any royalty issues for Peiker, and any issues Cellport has we will address with Dabendorf directly."  Ex. 77.  Mr. Sennecke responded that "Peiker will take no further action with respect to this matter unless requested by Cellport to do so . . . ."  Ex. 82 at 3.  Peiker heard nothing from Cellport concerning the Snap-in-Adaptor for the next three years.

Nevertheless, internally Peiker continued to believe that the Snap-in-Adapter triggered a royalty obligation to Cellport.  In a July 13, 2007 proposal to BMW concerning a Snap-in-Adaptor for use with a Sony-Ericsson product, Peiker proposed pricing between 21.84 and 24.34 euros and added:

> [W]e would like to advise you again that, in our opinion, the SIA concept violates a Cellport patent which has already been recognized in the United States, and that corresponding license fees will thus incur.  PEIKER acustic, as a licensing partner of Cellport, is obligated to pay these licenses.  Based on our current knowledge, we assume a license fee of US $1-2.  PEIKER acustic will establish the incurring license fees for BMW and add them to the serial price.
>
> This pertains to US Patent 6,341,218B1, which describes the supporting mechanism between a "Cradle" and a "Base Plate" in the chapter "supporting and connecting a portable phone."

Ex. 117 (emphasis added).

This too is an "Attorneys' Eyes Only" document.  Peiker did not reveal that thinking to Cellport at the time.  So far as the evidence disclosed, BMW never agreed to pay anything to cover a royalty obligation to Cellport.

On June 12, 2008 Mr. Kennedy sent a "demand letter," discussed above, in which he suggested that Peiker might be in breach of the Agreement in respect to sales to Daimler.  Ex. 131.  Andreas Peiker himself responded, indicating that he was surprised by and took offense at this suggestion.  Ex. 132.  Mr. Kennedy's reply of July 10, 2008 reiterated Cellport's concern and added that there was an issue concerning "the failure to pay royalties on pocket adaptors Peiker supplies to BMW."  Ex. 137.  At least so far as the extensive documentary history of these parties' dealings shows, this was Cellport's first indication that it believed it was entitled to royalty payments from Peiker on the Snap-in-Adaptor.  Mr. Sennecke responded that the '218 patent did not cover the product.  Ex. 141 at 2.

2.   Are the Snap-in-Adaptor and the Baseplate Covered by the Agreement?

Although the Snap-in-Adaptor was already being sold in 2004 when the Agreement was executed, it was not identified in paragraph 3.5 as an existing product that was subject to the royalty requirement.  However, Cellport contends that it is a Universal Mobile Connectivity Product within the meaning of both paragraph 1.17(i) and 1.17 (iii).

As discussed several times earlier in this order, in order to fit under paragraph 1.17(i), the Snap-in-Adaptor and Baseplate would have to be a "Pocket/Docking Station" or "Pocket/Baseplate/Docking Station configuration."  The Snap-in-Adaptor holds a phone.  However, to be a "Pocket" under paragraph 1.13 of the Agreement, it must be a component of a "Universal Mobile Connectivity Product" that also includes a "Docking Station."  It must

establish connectivity with vehicle resources by connecting either to the "Docking Station" directly or through a "Docking Plate." *Id.*

The Snap-in-Adapter latches to the Baseplate, but there is no "Docking Station." It is a phone charger, connecting only to the vehicle's power system and to an external antenna if the vehicle has one. Neither the Snap-in-Adapter nor the Baseplate has processing capability. The Snap-in-Adapter is essentially the functional equivalent of a CSB cord plugged into the vehicle's cigarette lighter that charges the phone, with the additional benefit that it secures the phone so that it does not become a missile flying around and potentially causing injury in the event of an accident.

Accordingly, this product is not a "Universal Mobile Connectivity Product" within the meaning of paragraph 1.17(i) of the Agreement. However, I do agree that the Snap-in-Adaptor and Baseplate potentially fit within paragraph 1.17(iii). In combination they constitute a device for using a portable phone in a vehicle. <u>If</u> the device utilizes technology covered by a listed patent, <u>then</u> it is a "Universal Mobile Connectivity Product" and would be a "Licensed Product" covered by the Agreement.

3.   <u>Claim 37 of the '218 Patent.</u>

The only patent mentioned in 2004 and 2005 as having possible application to the Snap-in-Adapter and Baseplate was the '218 patent which concerns a latching mechanism. Cellport did not initially identify Claim 37 of the '218 patent as a claim under which it was seeking royalties in this case. Claim 37 of the '218 patent entered the case because Peiker has indicated that it was because of that claim that it originally offered a $1.00 royalty on the Snap-in-Adapter; and it was because that claim was cancelled in a reexamination process that Peiker now disputes

any royalty obligation.  As the trial progressed, however, Cellport began to argue that Claim 37

is an alternative basis for its claim for royalties on the Snap-in-Adapter and Baseplate.

Preliminarily, some history with respect to Claim 37 is necessary.  As I have indicated,

Cellport advised Peiker in 2005 that the Snap-in-Adapter presented no royalty issues, and that

Cellport would pursue the matter with Dabendorf.  Mr. Kennedy resurrected the Snap-in-Adaptor

issue in his letter of July 10, 2008.  That prompted Mr. Richter to undertake a search of the

patents listed in the Agreement.  He discovered that the '218 patent had been in reexamination

since 2005 pursuant to a request that had been made by Volkswagen and another party.

The United States Patent and Trademark Office ("PTO") issued an initial office action on

September 13, 2006.  Ex. 263.  Claims 9, 10, 17-32 and 41-45 of the '218 patent were

"confirmed."  Claims 33-35, 56 and 58 were listed as "patentable (Amended or new claims)."

Claims 1-8, 11-16, 36-40, 46-55, 57 and 59 were "rejected."  *Id.* at 377.  Specifically, the PTO

found, subject to further comment by Cellport and further consideration in light of any comment

received, that Claim 37 was rejected on the basis of obviousness under 35 U.S.C. § 103.  *Id.* at

421.  The rejection added that Claim 37 was "unpatentable" over the prior art of Braitberg and

Humphreys."  *Id.*

In its response dated November 13, 2006 Cellport requested that Claim 37 be cancelled.

*Id.* at 339.  Cellport stated that "the rejection of [Claim 37] as obvious [is] now moot.  *Id.* at 339,

364.  The process dragged on with respect to other claims.  The PTO's Inter Partes

reexamination certificate, which included the formal cancellation of Claim 37, was issued on

May 31, 2011.  *Id.* at 2, 7.

Cellport now argues that royalties were due under Claim 37 until that claim was formally

cancelled on May 31, 2011.  It relies on cases discussing the effect of a judicial determination of

invalidity in the context of a license agreement.  *See Cordis Corporation v. Medtronic, Inc.,* 780

F.2d 991 (Fed. Cir. 1985) and *Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 455 F.2d 1253 (6th Cir.

1972).  Peiker counters with cases holding that when a claim is cancelled in a reexamination it is

treated as if the claim never existed.  *See Collins Licensing, L.P. v. American Telephone and*

*Telegraph Co.,* 11 F.3d 1072, 1995 WL 452261, at *1 (Fed. Cir. 1993)(unpublished); *Spectros*

*Corp. v. Thermo Fisher Scientific, Inc.,* No. C 09-01996, 2012 WL 5523510, *1 (N.D. Cal. Nov.

13, 2012)*; Flexiteek Americas, Inc. v. Plasteak, Inc.,* No. 08-60996, 2012 WL 5364263, at *9

(S.D. Fla. Sept. 10, 2012).  *See also Standard Havens Products, Inc. v. Gencor Industries, Inc.,*

996 F.2d 1236, 1993 WL 172432, at *1 (Fed. Cir. 1993)(unpublished); *Gould v. Control Laser*

*Corp.,* 705 F.2d 1340, 1342 (Fed. Cir. 1983).

To understand Cellport's position one must go back to *Lear, Inc. v. Adkins,* 395 U.S.

653(1969) in which the Court discussed the tension between the law of contracts, under which a

licensee is bound to perform as he promised, and the patent laws, which limit a patentee's

monopoly to valid patents.  The Court held that a licensee is not estopped from asserting

invalidity as a defense to a suit to enforce the license agreement.  *Id.* at 670-71.  Moreover, the

licensee is not required to continue to pay royalties during the time it is challenging the patent.

*Id.* at 673-74.

The Sixth Circuit in *Troxel* held that, where the determination of invalidity was

accomplished by another litigant, the licensee may not recover royalties already paid.  465 F.2d

at 1257.  The court reasoned that such a "refund" policy would disincentivize licensees from

seeking a prompt determination of validity, discourage the licensing of patents, and deter

inventors from referring to the patent system in the first place.  *Id.* at 1257-58.  *Lear* was

distinguished on that basis.  *Id.* at 1259.

In *Cordis* the Federal Circuit found that a licensee challenging the validity of a patent can discontinue royalty payments and thereby breach the licensing agreement, per *Lear,* or continue to reap the benefits of the license and to make royalty payments to the licensor.  If invalidity is ultimately determined, then the licensee may try to recoup the payment made during the invalidity litigation.  780 F.2d at 995.  The court added, "[t]he Troxel decisions only prohibit the licensee from recovering and retaining royalties paid or due prior to the adjudication of invalidity when the challenge to the patent was made by a third party."  780 F.2d at 996.

Cellport argues that these cases establish that where, as here, a third party challenges a patent, the licensee is obligated to make royalty payments until the patent is invalidated.  It distinguishes Peiker's cases on the basis that they did not involve a license agreement.  I do agree that the Agreement here brings into the picture the tension between contract law and patent law.  However, I am not persuaded by Cellport's position for several reasons.

First, the Scheduling Order in this case [#61] set a deadline of February 12, 2010 for Cellport to disclose its list of asserted patent claims.  *Id.* at 7.  Cellport's disclosure listed only Claim 9 with respect to the '218 patent.  Ex. 390 at 1.  Cellport confirmed this several subsequent times in interrogatory answers and supplements.  Ex. 208 at 4; ex. 215 at 7; and ex. 217 at 10.  Cellport reacted opportunistically to Peiker's position regarding Claim 37.  While a trial court has the discretion to permit a party to amend its pleadings to conform to the evidence (a request that Cellport to this day has not made), I decline to do so in this instance.

Second, during the three years between Mr. Quartner's indication that Cellport did not claim a royalty under the Agreement for this product and Mr. Kennedy's reversal of that position, Peiker sold more than 100,000 of the Snap-in-Adaptors and perhaps as many Baseplates.  *See* Ex. 393.  Peiker indicated that it would not have been economical to pursue that

product if it had to pay a $2.00 royalty.  There was no contrary evidence.  That by itself indicates that Cellport should be estopped from obtaining a $2.00 royalty retroactively.

Third, the only cases presented to the Court where a claim was rejected during a reexamination process suggest that rejection in that context voids the patent *ab initio*.  A reexamination is different from a judicial determination of invalidity.  *See, e.g., Flexiteek,* 2012 WL 5364263 at *9.  Application of those cases strikes me as even more compelling in light of the fact that Cellport voluntarily requested that Claim 37 be cancelled after receiving the initial office action.

4.  Claim 9 of the '218 Patent.

I then turn to the claim that Cellport has all along relied upon with respect to the Snap-in-Adapter and Baseplate.  Claim 9 reads as follows:

> *An adaptor for hands-free operation of a portable phone*, comprising:
>
> a pocket member having a receiving section and a mounting section, said receiving section disposed on the front of said pocket member and adapted to receive a portable phone, a first latching mechanism disposed within said pocket member to secure the portable phone within said receiving section, said mounting section disposed on the back of said pocket member and having a plurality of apertures for engagement with second latching mechanism in an interface module, a first connector interfacing with the electronics of the interface module, and a second connector interfacing with the electronics of the portable phone;
>
> an interface module having a receiving section disposed on the front of said interface module and configured to mate with said mounting section of said pocket member, a second latching mechanism independent of said first latching mechanism to retain said pocket member in said receiving section *and movable between a first position in which the pocket member is not engaged by said latching mechanism, and a second position in which said pocket member is engaged by said latching mechanism*[5] and comprising a plurality of latch members disposed for alignment with said apertures of said mounting section

---

[5] Claim 9 originally and incorrectly used the phrase "a first position in which the pocket member is engaged by said latching mechanism, and a second position in which said pocket member is not engaged by said latching mechanism" in the second element.  The parties agree that this was corrected on re-examination to state that the pocket member is not engaged in the first position but is engaged in the second position.

of said pocket member when said pocket member is mated with said interface module, and a connector interfacing with said first connector of said pocket member;

wherein when said mounting section of said pocket member is seated within said receiving section of said interface module said latch members extend through said apertures and move from said first position to said second position to secure said interface module to said pocket member.

Ex. 242 at 24-25 (emphasis added).

This is the only claim that Cellport presented to Dr. Perkins for analysis. However, Dr. Perkins acknowledged that he was not asked to perform an infringement analysis, i.e., to determine whether the Snap-in-Adapter satisfied all the requirements of Claim 9. Tr. at 648. Rather, counsel provided various phrases that are found within Claim 9 to him and asked whether those phrases apply to the product. Peiker argues that the Snap-in-Adapter and Baseplate do not utilize Cellport's patented technology, i.e., do not infringe Claim 9 of the '218 patent, for three reasons. I agree with two of them.

First, Claim 9 is a claim for an "adaptor for hands-free operation of a portable phone." The Snap-in-Adapter and baseplate are not involved in the hands-free operation of the phone. That is performed by a direct Bluetooth connection between the phone and the head unit of the vehicle. Dr. Perkins acknowledged that all the functionalities of the phone other than charging and connecting to an external antenna would be available to the user regardless whether the phone was inserted in the Snap-in-Adaptor or was sitting in the driver's pocket.

Second, although the claim does not contain the words "limited one-dimensional movement," in this Court's Markman order it found that insertion of the pocket with a limited, one-dimensional movement was a key aspect of the invention. Order [#201] at 20-21. During the trial counsel for Peiker demonstrated how, in counsel's opinion, the Snap-in-Adapter cannot be attached to the Baseplate with a one-dimensional movement. Counsel for Cellport

demonstrated how, in his opinion, the Snap-in-Adapter can be inserted with a one dimensional movement.  Interestingly, Dr. Perkins testified that it requires movement in three dimensions to accomplish that task.

Peiker's counsel suggested that the Court would try it and make its own decision. However, my decision on this element of Claim 9 is fueled by different evidence.  In notes attached to the minutes of the November 16, 2004 meeting, Mr. Richter, under the heading "BMW Snap-in-Adapter," wrote, "movement in one single dimension."  He now says that this was not an admission or an indication that he believed that movement in only one dimension was required.  However, if a "limited one-dimensional movement" is a key to the invention, then it is just as key to Claim 37 as it is to Claim 9.  The phrase is not mentioned in either claim.  But Peiker admits that Claim 37 infringed the '218 patent until it was cancelled in the reexamination. If so, then it necessarily admits that the Snap-in-Adapter could be inserted in the Baseplate with what amounts to a one-dimensional movement.  Notwithstanding what Dr. Perkins or Peiker's counsel now say, I will hold Peiker to that admission.

Third, Claim 9 specifies that the latch members move from "a first position in which the pocket member is not engaged by said latching mechanism" to "a second position in which said pocket member is engaged by said latching mechanism" to secure the Snap-in-Adapter.  The Court discussed this in its Markman order.  [#201] at 22-23.  This is not a requirement of Claim 37, and therefore, the reasoning I applied to the "limited one-dimensional movement" element does not apply.  I agree with Peiker that the Snap-in-Adaptor has a single position that moves and returns to its original position.  The latch is in the same position regardless whether the Snap-in-Adaptor is engaged or disengaged.

Accordingly, although the Court does not agree with Peiker's second argument, it does agree with the other two. The Court finds that the Snap-in-Adaptor does not practice Claim 9.

5. The '825 and '456 Patents.

Peiker's counsel indicated in his closing argument that Cellport had recently asserted, in discovery responses, that the '825 and '456 patents apply to the Snap-in-Adaptor and Baseplate. I do not recall Cellport's making this argument during the trial. In any event, because the Snap-in-Adaptor and Baseplate have no processing capability or functionalities such as those contemplated in the '825 patent, it cannot apply. Similarly, because the Snap-in-Adapter does not perform audio signal processing functions, the '456 patent does not apply.

6. Conclusion.

For the foregoing reasons, the Court concludes that Cellport has no claim for royalties with respect to Peiker's sales to BMW of either the Snap-in-Adaptor or the baseplate.

**F. CKVI (Audi).**

1. History of This Product.

According to Mr. Kennedy, the Audi system was originally designed by a company called Cullmann. He understood that this system had a pocket, a docking plate and a docking station. Cullmann supplied the pocket and docking plate. Harman/Becker, a subsidiary of Harman International, supplied the docking station. Tr. at 384-387. Mr. Kennedy testified that Cullmann had a license agreement with Cellport with respect to the pocket and docking plate, and that Harman/Becker had a license agreement with Cellport with respect to the docking station. *Id.* at 387.

In 2005 or 2006 Cullmann was sold to a company called Paragon, which took over production of the pocket and the docking plate, as well as Cullmann's obligation to Cellport under their license. Harman/Becker continued to produce the docking station. Although Paragon was a licensee, it did not pay any royalties to Cellport. According to Mr. Kennedy, this is because Paragon went into bankruptcy proceedings. *Id.* at 388. Cellport does not suggest that Peiker agreed to assume a license obligation from Paragon or Cullman. Rather, to the extent that Peiker may be supplying the same pocket, Cellport believes that Peiker has a royalty obligation under the Agreement.

Peiker's sales of CKVI's to Audi began in 2010, during the course of this lawsuit. According to ex. 363, Peiker sold 7,531 of these in 2010; 12,828 in 2011; and 3,250 in 2012. Ex. 363.

### 2.  Are CKVI's "Licensed Products"?

Mr. Richter testified that the CKVI is similar in functionality to the BMW Snap-in-Adapter. It charges the phone and the vehicle's antenna. Tr. at 1020-21. However, the hands-free functionalities are all done between the phone and the vehicle, using a Bluetooth connection. *Id.* at 1022. Plaintiff's expert, Dr. Perkins, agreed that the CKVI performs a charging function and an antenna connection, and that it can detect the presence of a phone. *Id.* at 703. He also agreed that the phone call processing signals are communicated directly from the phone to the head unit via Bluetooth. *Id.*

Mr. Kennedy agreed that, based on his understanding of the CKVI, it charged the phone and provided connectivity to the antenna. He thought there was connectivity with other vehicle resources, but he could not identify initially identify them. *Id.* at 391. In response to leading questions, he testified that he thinks that the CKVI also established connectivity with the

vehicles "audio."  *Id.* at 395.  In his opinion it is a "Pocket" as defined in the Agreement.  *Id.* at 393.

    3.  <u>Conclusions.</u>

    The inclusion of the CKVI in this case appears to be based on suspicion and the fact that Cullmann had paid a royalty on what Mr. Kennedy believes was a predecessor of this product.  It was apparent to this Court that Mr. Kennedy was not well versed in the actual functioning of this product.  Setting aside the question whether the CKVI could be viewed as covered by paragraph 1.17(i) of the Agreement, as Cellport suggests, the Court concludes that there was no evidence that it utilizes Cellport's patented technology.  Rather, the Court finds Peiker's evidence that it does not use technology covered by any Cellport patent to be persuasive.

    **G.**  <u>**Interest Rate.**</u>

    Because the Court has found that Peiker must pay certain unpaid royalties to Cellport, it must address the subject of pre-judgment interest.  The parties do not agree upon the appropriate interest rate.

    Under paragraph 3.4 of the Agreement, entitled "Audit Right," Peiker must permit an independent auditor appointed by Cellport to verify royalty payments due to Cellport.  The auditor must be given access to relevant records for this purpose.  Cellport is entitled to request an independent audit once per calendar year or more frequently if Cellport has good cause.  If the audit reveals underpayments, then in addition to completing the payments due, Peiker must pay interest on the underpaid amount at the rate of 1.5% per month from the date due to the date paid.  It does not specify whether the interest would be simple or compounded.  If the audit does not reveal an underpayment greater than five percent of the amount due, then Cellport must pay for the audit.  Otherwise, Peiker pays for the audit.

Cellport argues that this paragraph requires the Court to award pre-judgment interest at 1.5% per month on the amount determined by the Court to be owed for unpaid royalties.  I do not agree.  Cellport did not invoke paragraph 3.4.  An independent audit was never requested or performed.  A rate of 1.5% per month or 18% per year, even simple interest, is beyond anything that is commercially reasonable.  Nevertheless, these are sophisticated parties, armed with sophisticated attorneys.  I would not hesitate to order Peiker to pay interest at that rate if the Agreement required it.  However, it does not.  Cellport does not accuse Peiker in this case of miscalculating royalties believed to be owed, such as royalties on the CKII cradles that were part of the CKII/PSC/UHI system purchased by Daimler.  The dispute is not an accounting dispute but one of interpretation of the contract and the patents, which is a function for the Court, not an auditor.

The Agreement specifies that the Agreement is to be governed by Colorado law except to the extent that United States patent law applies.  United States patent law does not supply a prejudgment interest rate.  Therefore, the Court applies C.R.S. § 5-12-102 which provides that when money is wrongfully withheld, interest shall be either an amount that recognizes the benefit realized by the person withholding such money or, at the election of the claimant, eight percent per annum from the date of wrongful withholding.  Cellport has not introduced evidence of the benefit to Peiker of withholding royalties due on CKII's or CKIV's sold to Daimler, which I interpret as its election to accept the statutory rate in the event that the Court determines that paragraph 3.4 of the Agreement does not apply.

**H.  Damages.**

The parties' respective damages experts, James Graham and Kenton Guilbert, essentially agree on the number of sales Peiker made of the various disputed products and the amount of

money that would be due as to each product, exclusive of interest, if the Court determined that royalties were owed.  The experts used different interest rates as directed by the parties' respective lawyers.  Because of my resolution of the interest rate issue, I will use Mr. Guilbert's numbers as set forth in detail in exhibit 350 and summarized in exhibit 351.

Accordingly, the amounts owed through September 17, 2012, being the original first date of trial (the trial started four days later due to a conflict on the Court's docket), including interest, are:

| | |
|---|---|
| CKII-Daimler | $218,357 |
| CKIV-Daimler | $395,086 |
| TOTAL | $613,443 |

**Order**

1. The Court enters its final judgment in favor the plaintiff, Cellport Systems, Inc. and against the defendant Peiker Acustic GMBH & Co. KG, on plaintiff's First Claim for Relief (breach of contract) insofar as it relates to unpaid royalties due on the sales of CKII and CKIV products to Daimler.  The Court awards damages, including pre-judgment interest calculated through September 17, 2012, in the amount of $613,443. Prejudgment interest at the statutory rate will continue to run from September 18, 2012 to the date of this judgment.  Post-judgment at the statutory rate will run from the date of judgment until the judgment is satisfied.

2. The Court finds that Cellport's Second Claim for Relief is moot.

3. The Court enters judgment in favor of Cellport and against Peiker on Peiker's First Counterclaim insofar as Peiker sought a declaration of noninfringement as to the CKII and CKIV products sold to Daimler.

4. The Court enters judgment in favor of Cellport Systems, Inc. and against Peiker Acustic GMBH & Co. KG on Peiker's Second, Third and Fourth Counterclaims.

5. The Court enters judgment in favor of Peiker Acustic GMBH & Co. KG and against Cellport Systems, Inc. on plaintiff's First Claim insofar as it relates to royalties claimed on the sales of CKII/CIB systems sold to Volkswagen and BMW; BT-PSC's; Snap-in-Adapters and Baseplates sold to BMW; and CKVI's sold to Audi.

6. Likewise, the Court enters judgment in favor of Peiker and against Cellport on Peiker's First Counterclaim insofar as Peiker sought a declaration of noninfringement as to those products. Specifically, the Court declares that Peiker's sales of CKII/CIB systems to Volkswagen and BMW; BT-PSC's; Snap-in-Adapters and Baseplates sold to BMW; and CKVI's sold to Audi do not infringe the '825, the '456 or the '218 patents.

7. Cellport prevailed with respect to two of the seven disputed products. Peiker prevailed with respect to five of the seven disputed products. Cellport obtained a monetary judgment. However, because of the royalty amounts assigned to the various products and the interest rate, Cellport will realize only a small percentage of the damages it sought. Peiker will have to pay damages, but it obtained a declaration of non-infringement as to the five products as to which it prevailed. Because both parties were only partially successful, the Court exercises its discretion not to award costs under Fed. R. Civ. P. 54(d). *See AeroTech, Inc. v. Estes,* 110 F.3d 1523, 1626 (10th Cir. 1997). The Court also finds that neither party is "[t]he prevailing party" for purposes of an award of attorney's fees, costs and expenses under paragraph 10.3 of the Agreement.

DATED this 2nd day of January, 2013.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge