IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No.  09-cv-01007-RBJ-MJW

CELLPORT SYSTEMS, INC.,

     Plaintiff,

v.

PEIKER ACUSTIC GMBH & CO. KG,

     Defendant.

---

## ORDER

---

In a joint status report filed July 16, 2015 the parties asked the Court to address two

substantive issues, promising that upon receiving the Court's answers they would stipulate to

damages if the Court resolved either issue in Cellport's favor.  This order addresses the two

issues.  Perhaps it will finally bring an end to a very old case.

## BACKGROUND

This case concerns technology that Cellport created to enable individuals to connect a

variety of mobile phones to the same vehicle through interchangeable "pockets" that fit a

common interface system.  In 2004 Cellport licensed certain of its patented technology to Peiker,

a company that develops and sells hands-free components for mobile phones.  A dispute later

arose between the parties, both as to the interpretation and application of the "License

Agreement" and as to the effect of Cellport's patents, resulting in the present case.

The Court first issued orders interpreting the License Agreement and certain terms in the

involved patents.  The case was then tried to the Court in September 2012.  At issue were

Cellport's claims to royalties on Peiker's sales of seven products.  The Court's Order and Judgment issued on January 2, 2013 provides a detailed discussion of the dispute and its history. ECF No. 259.  Although the Court resolved the issues concerning two of the disputed products in Cellport's favor, and awarded Cellport damages and interest totaling $613,443, Cellport considered the result a loss and appealed.  In large part the Court of Appeals agreed with Cellport.  *See Cellport Systems, Inc. v. Peiker Acustic GMBH & Co. KG,* 762 F.3d 1016 (10th Cir. 2014).

On remand this Court was instructed to determine (1) royalties owed by Peiker to Cellport under the Licensing Agreement with respect to Peiker's CKII/CIB product sold to Volkswagen; (2) the same with respect to the CKII/CIB product Peiker sold to BMW; (3) whether § 1.17(i) of the Licensing Agreement applies to Peiker's CKVI product sold to Audi, and if so, the royalties due under the contract; (4) whether Peiker's BT-PSC product practices Cellport's '456 patent, and if so, the royalties due; and (5) whether, in view of the appellate order and this Court's rulings on remand, there is a "prevailing party" which is entitled to an award of attorney's fees, costs and expenses under the Licensing Agreement.  *See* ECF No. 275 at 11-22. The remand also directed this Court to vacate the part of its judgment which, as I understand it, prematurely applied the '456 patent while an appeal of the revocation of the patent was pending. *Id.* at 22-24.

The parties briefed the issues on remand.  ECF Nos. 293, 294 and 295.  However, in a joint status report filed on the same day as Cellport's reply brief the parties asked the Court first to determine the manner in which pre-judgment interest will be calculated.  ECF No. 296.  The parties stated: "Once that issue is decided, the Parties will endeavor to stipulate to damages for

the VW CKII/CIB and BMW CKII/CIB products, as well as any other products as to which the Court finds liability." *Id.* at 1.

Therefore, in an order issued April 29, 2015 the Court addressed the pre-judgment interest issue. ECF No. 301. I had previously determined, and the Tenth Circuit agreed, that the appropriate rate of interest was Colorado's statutory rate per C.R.S. § 5-12-102. In the April 29 order I determined that pre-judgment interest ran from the date royalty payments were due, meaning the date that the product was shipped by or on behalf of Peiker or a Peiker subsidiary. *Id.* at 3-4.

However, that order did not lead to resolution of all of the remaining issues. In their July 16, 2015 joint status report the parties asked this Court to decide (1) whether Cellport is entitled to payments on the CKVI product, and (2) whether Cellport is entitled to payments on the BT-PSC product. The parties represented that they would stipulate to damages if the Court determines that Peiker is liable on either or both of those products. ECF No. 304 at 1. They also advised the Court that they had reached a stipulation on damages due to Cellport on the CKII/CIB products sold to Volkswagen and BMW but note, ominously, that the damages to which they agreed on those products remained unpaid as of the date of their stipulation. I will have nothing to say about those unpaid damages in this order but will await the next chapter in the parties' long feud if it comes to that.

In neither of the parties' joint status reports have they mentioned the fifth issue listed by the Tenth Circuit for consideration on remand, i.e., a possible award of attorney's fees and costs. Perhaps they can resolve that matter between them as well. In any event, I turn to the two products where Cellport's entitlement to royalties is still at issue.

## THE CKVI PRODUCT

### A.  This Court's January 2, 2013 Order.

Before and during trial Cellport argued that the CKVI was a licensed product under paragraph 1.17(i) of the Licensing Agreement.  Peiker argued that the CKVI product did not utilize Cellport's patented technology and, therefore, did not infringe any Cellport patent.

In an order issued February 6, 2012 I had interpreted paragraph 1.17(i) as creating a rebuttable presumption that products that fit the requirements of the paragraph utilize Cellport's patented technology.  ECF No. 201 at 11-12.  In my January 2, 2013 order I wrote:

> "Setting aside the question whether the CKVI could be viewed as covered by paragraph 1.17(i) of the Agreement, as Cellport suggests, the Court concludes that there was no evidence that it utilizes Cellport's patented technology.  Rather, the Court finds Peiker's evidence that it does not use technology covered by any Cellport patent to be persuasive."

ECF No. 259 at 42.

Accordingly, because I concluded that Peiker had successfully rebutted the contractual presumption, I did not award royalties on the sales of the CKVI product.

### B.  The Tenth Circuit's Order.

The Circuit did not agree with this Court's interpretation of the License Agreement as creating a rebuttable presumption.  Rather, the License Agreement provides that royalties are owed on certain products regardless whether they infringe any Cellport patent.  *Cellport Systems,* 762 F. 3d at 1022-23.  "[I]nfringement is irrelevant if a product is covered by the text of 1.17(i).  We therefore remand to the district court to consider whether royalties are due on the product under the terms of the contract."  *Id.* at 1023.

### C.  The Parties' Positions on Remand.

1. Cellport.

Cellport argues that the CKVI cradle is a "Pocket" under paragraph 1.13 of the License Agreement.[1]  The also argues that the CKVI cradle was a component of an Audi system that meets the requirement of a "Universal Mobile Connectivity Product" under paragraph 1.17 of the License Agreement.[2]  Under both paragraphs the CKVI is a Licensed Product on which royalties are due.

2. Peiker.

Peiker does not dispute that CKVI cradle satisfied two of the elements of a Pocket – it holds a mobile phone and establishes connectivity with vehicle resources.  Specifically, Peiker states that the CKVI's function is to charge the phone, to assist in pairing the phone to the vehicle, and to provide connectivity to the external antenna.  However, the Audi system of which the CKVI was a component did not contain a "Docking Station."[3]  Since both paragraphs 1.13 and 1.17 require a system that includes a Docking Station, the CKVI is not covered.

---

[1] A Pocket is (1) an interchangeable component of a Universal Mobile Connectivity Product that includes a separate Docking Station [which] (2) holds the portable wireless device and (3) establishes connectivity with vehicle resources by connecting either to such Docking Station directly or through a Docking Plate. Ex. 45 at ¶1.13 (numbers added).

[2] Universal Mobile Connectivity Products are (1) systems, devices or sets of components for using portable wireless devices in vehicles, (2) that work with more than one make or model of portable wireless device by substituting interchangeable Pockets that establish a physical, electrical and/or logical interface for the portable device to the remaining components of the system, and (3) consisting of a Pocket/Docking Station configuration, Pocket/Docking Plate/Docking Station configuration, or Pocket/Docking Plate/TCU configuration, which the Parties acknowledge utilize technology, designs or architecture covered by one or more of the claims included in the Licensed Patents. Ex. 45 at ¶1.17. (numbers added).

[3] The term **Docking Station** means "the components of a Universal Mobile Connectivity Product, which utilizes Pockets, other than the Pocket.  The Docking Station interfaces with vehicle resources, such as power, audio, antenna and/or other vehicle electronics, either directly or through a Docking Plate, with a

D. **Resolution on Remand**.

Cellport relies primarily on the testimony of its Chief Executive Officer, Pat Kennedy, and its retained expert, Dr. Michal Perkins.  Mr. Kennedy testified that he first learned that Peiker was selling the CKVI to Audi from documents produced in this litigation.  Day Three Transcript [ECF No. 248] at 383.  However, that was not his first knowledge of a system used by Audi for hands-free mobile phone operation in its vehicles.  The system was originally designed by a company called Cullman and included a pocket and a docking plate manufactured by Cullman pursuant to a license from Cellport and a docking station manufactured by Harman/Becker pursuant to a license from Cellport.  *Id.* at 384-87.

Mr. Kennedy says that in 2005 or 2006 Cullman was purchased by Paragon, which took over production of the pocket and docking plate as well as Cullman's obligation to Cellport.  Harman/Becker continued to make the docking station.  *Id.* at 388.  Shortly after purchasing Cullman, Paragon initiated bankruptcy proceedings.  Mr. Kennedy's understanding is that Paragon continued to supply pockets, but Peiker also became a supplier of pockets for the Audi system.  *Id.* at 389.  It is undisputed that Peiker began selling CKVI cradles to Audi in 2010.

Assuming the accuracy of Mr. Kennedy's historical account of the development of the original Audi system, the question is whether that system changed in a material way by the time Peiker became involved.  Mr. Kennedy testified that his contacts at Harman/Becker told him that the architecture of the Audi system has not changed.  *Id.* at 514.  He also testified that Harman/Becker still supplied the docking station and still paid royalties to Cellport.  *Id.* at 389.

Of course, one question is whether the "docking station" supplied by Harman/Becker is a "Docking Station" as defined in Cellport's License Agreement with Peiker.  Under cross-

---

Pocket.  When the Docking Station interfaces with the Pocket through a Docking Plate, it is sometimes referred to as a "TCU" or "telematics control unit."  Ex. 45 at ¶1.5.

examination Mr. Kennedy did not appear to be well versed in the technical functionality of the docking station provided by Harman/Becker.  Asked whether that device performed "a main set of functionalities" (a term from the '825 patent, not the License Agreement), he could only say that he believed it did.  *Id.* at 510.

Likewise, Mr. Kennedy was not well versed in the functionality of the CKVI.  He thinks the CKVI cradle is similar to the "Cullman Harman product."  *Id.* at 510-11.  However, he does not know whether the CKVI handles hands-free functionalities between the phone and the car. *Id.* at 511.  When asked whether the CKVI processes or conveys data and audio signals between the phone and the car, he responded that what he has been able to determine is that it secures the phone, latches onto a docking plate, and at a minimum, charges the phone and connects to an external antenna.  *Id.*  He does not know whether, if that is all it does, it would be a "main set of functionalities."  *Id.* at 512.  He knows that the CKVI has a processor, but he does not know what the processor does.  *Id.* at 513.

Cellport's other witness on the CKVI, Dr. Perkins, testified that the CKVI is "a pocket which connects to a phone and the pocket in turn connects to a docking plate and via the docking plate a docking station."  Day Four Transcript [ECF No 249] at 639.  This opinion was based on his examination of Peiker documents.  In his opinion the system meets the requirements of a Universal Mobile Connectivity Product because (1) it is a system for using mobile phones in vehicles; (2) it works with more than one make or model of mobile phones by substituting interchangeable pockets that have a physical and electrical interface with the docking plate and a logical interface via software that permits the processor unit to communicate with the customer-control apparatus and the phone; and (3) it is a pocket/docking plate/docking station configuration, *id.* at 641-45.  Referring to a block diagram on page 5 of 49 of Ex. 270, he

identifies the block labeled "Kunden Applikation/Steuergerat" or Customer Control Apparatus in English as the docking station. *Id.* at 646-47.

On cross-examination Dr. Perkins testified that the functionalities supported by the CKVI are detecting the presence of a phone, charging, antenna connection, and some ability (which he could not explain further) to communicate from the CKVI to the customer's steering apparatus. *Id.* at 703. He acknowledged that all audio and phone call processing signals are communicated directly from the phone to the head unit via Bluetooth, and the CKVI is not involved. *Id.* Thus, like the BMW snap-in adapter, a user would have access to all of the features of his phone whether the phone was snapped into the Audi or in his coat pocket. *Id.* at 703-04. He added, on re-direct examination, that the advantage of having the phone in the CKVI rather than in his pocket is that the CKVI charges the phone, it physically secures the phone in a convenient location, and perhaps (he doesn't know) it allows the customer to use the buttons on the steering wheel to operate it. *Id.* at 705-06. He believes there is more functionality than just charging because the block diagram shows the CKVI connecting to the customer-control apparatus. He admits that, despite all the Peiker documents he has seen, the customer-control apparatus is still "a mystery to me," but he knows that it is connected via wires to the processor in the CKVI." *Id.* at 706-08.

Peiker's evidence on the CKVI was primarily the testimony of Lutz Richter, Peiker's Vice President for Product Strategy and Intellectual Property. He said that the function of the CKVI cradle is similar to the BMW snap-in adapter (a product that I concluded did not qualify for royalty payments in my January 2, 2013 order). It holds and charges the mobile phone and connects the phone to the external antenna. Day Six Transcript [ECF No. 251] at 1021. It also has a button that triggers the pairing procedure between the phone and the vehicle's head unit.

*Id.* at 1021-22.  Referring to the block diagram in Ex. 270, he testified that the box labeled "Kunden application/Steuergerat" refers to the head unit.  *Id.* at 1023.

In my effort to resolve whether the CKVI was a Pocket or just a "charger," I went back to the beginning of the trial and reviewed what counsel had to say about it in their opening statements.  Among other things, Cellport' counsel stated, "Cellport will show that the CKVI [sold] to Audi is substantially similar to the CKIV that Peiker sells to Daimler.  Cellport can show that independently but also through Peiker's admissions.  You will hear from Peiker witnesses and documents that the CKIV concept was the model for the Audi CKVI." Day One Transcript [ECF No. 246] at 31.[4]

So far as I can tell, one Peiker document that counsel had in mind was a German-language document, designated "Highly Confidential – Attorneys' Eyes Only," that was admitted as Ex. 175.  Entitled "Konzept for AUDI CKVI," it has a block diagram that contains what appear to be three similar block diagrams labeled "AUDI CKVI," "AUDI CKVI a4G," and "MBA CKIV."  *Id.* at Bates #PEIKER048316.  When Mr. Richter was asked about the diagram, he testified that the reference to the MBA CKIV was to a Daimler CKIV that worked only as a charger.  Day Six Transcript [ECF No. 251] at 1075, 1120.  He acknowledged that the CKVI might have been called a CKIV in the development process.  *Id.* at 1076-77.

The problem is, this Court determined in its January 2, 2013 order, contrary to Peiker's position, that the Peiker CKIV sold to Daimler was a Licensed Product.  It was a Bluetooth version of another CKII cradle sold to Daimler which I also determined, contrary to Peiker's

---

[4] At that time Cellport's position was that the CKVI cradle was covered by paragraph 3.5 as well as by paragraph 1.17 of the License Agreement.  *Id.*  Paragraph 3.5 provides that any products that are substantially similar to three listed products that Peiker was then making, including a CKII cradle then being sold to Daimler, would be deemed to be Licensed Products.  Cellport did not make the paragraph 3.5 argument on remand.

position, was a Licensed Product.  I sharply criticized Peiker for engaging in inequitable conduct in respect to both cradles.  ECF No. 259 at 8-15.

It is also worth noting the history of Peiker's "CK" cradles to the extent that the record documents that history.  The original CKII cradle that Peiker sold to Daimler was the basis for Cellport's first suit against Peiker.  The License Agreement emerged from a settlement of that suit.  As noted, it listed that original CKII/Daimler cradle as a License Product.  But when Peiker began selling a different version of the CKII to Daimler, it took the position that it owed no royalties on that version or on the Bluetooth version called a CKIV.  As noted above, I rejected that position.  Similarly, Peiker refused to pay royalties on CKII cradles, called "CKII/CIB" products, that it sold to Volkswagen and BMW.  But during this litigation Peiker admitted that the License Agreement covered both of them, and as I mentioned near the beginning of this order, the parties have now stipulated to the royalties due with respect to the two CKII/CIB products.  Given that history, I am less inclined to credit Peiker's similar position that it owes no royalties on its CKVI cradle.

I grant that Mr. Kennedy's testimony is not compelling.  I will assume that the Cullman-Harman/Becker version of the Audi system contained something called a docking station.  Giving Mr. Kennedy the benefit of the doubt, I will further assume that the docking station in that system would qualify as a "Docking Station" as that term is defined in Cellport's License Agreement with Peiker.  However, the proposition that the version of the Audi system that used a Peiker CKVI cradle contained a docking system is based primarily on hearsay that the architecture did not change.  It would have been quite helpful to have heard from a knowledgeable representative of Harman-Becker.  For whatever reason, that did not happen.

I also grant that Dr. Perkins' testimony was not compelling. He did not fully understand the functionality of the CKVI, and – if you believe Mr. Richter – he apparently misinterpreted the "mystery" box in the block diagram in exhibit 270.

Nevertheless, I resolve this issue in Cellport's favor. For one thing, the fact that (according to Mr. Kennedy) Harman-Becker has continued to pay royalties to Cellport on a docking station that it supplies for the Audi system provides some support for Cellport's position. Also, if as it appears the CKVI cradle sold to Audi is similar to the CKIV cradle sold to Daimler, then since I have determined that the CKIV cradle sold to Daimler was a Licensed Product, it would follow that the CKVI cradle is a Licensed Product. Finally, I note that Peiker should have been in a better position than Cellport to demonstrate that the Audi system did not contain a docking station. However, Peiker provided relatively little evidence in that regard.[5]

## THE BT-PSC PRODUCT

### A. This Court's January 2, 2013 Order.

In the previous order I noted that the Peiker cradle initially connected through the Peiker System Connector or "PSC" to the interface module. The PSC was a hardwired baseplate. Cellport did not claim that Peiker owed royalties on the PSC. Peiker began converting to a wireless connector, called the Bluetooth Peiker System Connector or "BT-PSC," in 2005, and thereafter the Bluetooth version became the connector of choice.

Peiker presented the BT-PSC at the March 23, 2006 annual meeting. Mr. Richter stated that the BT-PSC was not covered by the Agreement. Cellport did not dispute this at the time. However, Mr. Kennedy later became convinced Mr. Richter had not fully disclosed the product's functions and capabilities. Cellport decided that, unlike the original PSC, the BT-PSC is a

---

[5] Contrary to Peiker's brief, Mr. Richter did not testify at page 1023 that the Audi system does not have a docking station, although that might be an implication of his testimony. *See* ECF No. 251 at 1023.

processor, and therefore, it is a "Docking Station," not a "Docking Plate."  As such, Cellport

argued, the combination of a cradle with the BT-PSC meets the definition of a "Universal Mobile

Connectivity Product" in paragraph 1.17(i) of the Agreement.

I found that the fact that a hard wired connection was replaced with a wireless connection

did not make a difference in the functionality of the system.  Thus, like the PSC, I found that the

BT-PSC was a "Docking Plate," not a "Docking Station."  ECF No. 259 at 28.  As such, it was

not a "Universal Mobile Connectivity Product" within the meaning of paragraph 1.17(i) of the

Agreement.  *Id.*

I next considered whether the BT-PSC was covered by paragraph 1.17(iii) of the

licensing agreement.  Paragraph 1.17(iii) is a catch-all provision that identifies certain products

as "Universal Mobile Connectivity Products" even though they are not covered by paragraph

1.17(i).  Specifically, paragraph 1.17(iii) covers

> any other systems, devices or sets of components for using portable wireless
> devices in vehicles, or any one or more elements or components thereof, which
> utilize technology, designs or architecture covered by one or more of the claims
> included in the Licensed Patents.

If a product is covered by paragraph 1.17(iii), then Cellport has the burden to prove that

the product does use its patented technology.  I found that the BT-PSC did not practice Cellport's

'825 patent because it did not have a "main set of functionalities" as contemplated by the

invention and was not an interface module within the meaning of that patent.  *Id.* at 28-29.  I also

found that this product did not practice Cellport's '456 patent because it did not perform "signal

processing functions" such as echo cancellation, frequency equalization and noise reduction.  Id.

at 29.

B. **The Tenth Circuit's Order.**

The Tenth Circuit affirmed the finding that the BT-PSC is a docking plate, not a docking station, and therefore is not covered by paragraph 1.17(i) of the licensing agreement. *Cellport Systems,* 762 F.3d at 1025. The court then considered Cellport's argument that the BT-PSC is covered under section 1.17(iii) of the licensing agreement because it infringes the '456 patent. The court agreed that the independent claims in that patent require an interface module that performs signal processing functions. It noted that the claim did not define the term "signal processing functions," and that dependent claim 7 claimed a system "wherein[] said signal processing functions include substantially removing noise, acoustic echoes and line echoes from audio signals," consistent with this Court's construction of "signal processing functions" as "audio signal processing." *Id.* at 1026. However, the court's analysis of the specification of the '456 patent and the testimony of a Peiker expert led it to the conclusion that the BT-PSC does perform "signal processing." *Id.*

Therefore, "[b]ecause the district court only briefly addressed the relationship between the BT-PSC and the '456 Patent, we remand to allow the district court to determine whether – considering that the BT-PSC performs signal processing functions – the BT-PSC practices the '456 Patent and to calculate, if necessary, the royalties owed to Cellport." *Id.*

C. **The Parties' Positions on Remand.**

1. Cellport.

Briefly, Cellport argues that the '456 patent "contemplates in-vehicle communication systems containing 'holding systems' and 'interface modules,' each with their own processors."

Plaintiff Cellport's Brief on Remand [ECF No. 293] at 16.[6]   Cellport argues that the BT-PSC practices the '456 patent because (1) it is used with "a communication device for wirelessly receiving and sending information" (a mobile phone); (2) it is used with a "holding member" (a pocket); (3) it is an "interface module," because it secures and electronically connects with the pocket, and it provides an interface between the vehicle's systems and the phone; (4) it includes "a second processor housed by [the] holding member;" and (5) there is a "communication link between [the] first processor [in the BT-PSC] and [the] second processor [in the cradle]." *Id.* at 21-25.

   2. Peiker.

   Before the trial Peiker informed the Court that in "opposition proceeding" initiated by Volkswagen and Bury GmbH in the European Patent Office to challenge the validity of the '456 patent, the EPO had determined during a hearing on October 11, 2010 that the '456 patent was invalid.  ECF No. 218 at 2.  The EPO issued a written revocation of the patent on November 19, 2010.  *Id.*  However, Cellport appealed, and the parties agreed that the appeal suspended the EPO's invalidity determination pending the outcome of the appeal.

   Peiker now informs the Court that on November 14, 2014 -- approximately three and a half months after the Tenth Circuit issued its remand order and, coincidentally, the same day that Cellport filed its opening brief on remand -- the European Patent Office Board of Appeal dismissed Cellport's appeal.  Peiker's Response Brief on Remand [ECF No. 294] at 7-8.[7]  Under

---

[6] To be precise, Claim 1 describes a system that includes, among other things, a "holding member." Claim 9 describes a system that includes, among other things, a first and second "holding assembly."  Ex. 247 at 19, 20 of 35.  The terms "holding member" and "holding assembly" refer to what Peiker calls a cradle and what Cellport calls a pocket.

[7] Cellport states that the date was November 24, 2014.  That is incorrect and apparently is just a typo. Alexander Otten, a German patent attorney, states in his declaration that the date of the decision to dismiss the appeal was November 14, 2014.  ECF No. 294-1 at 3, ¶8.  Cellport acknowledges that the decision was made on the day it filed its opening brief, which was November 14, 2014.

the European Patent Convention, the revocation operates to invalidate the patent *ab initio.*  Id. at

8 (citing Article 68 of the Convention).  Peiker argues that because the EPO has now made a

final determination that the '456 patent was void *ab initio,* and therefore that effectively there

never was a valid patent, the '456 patent cannot support a claim for royalties based upon patent

infringement.  *Id.* at 7-11.

In any event, Peiker argues that Cellport did not meet its burden of demonstrating that the

BT-PSC infringes either Claim 1 or Claim 9 of the '456 patent.  No Cellport witness at trial even

addressed whether the BT-PSC satisfied any claim of the '456 patent.  *Id.* at 11-12.  Nor could

Cellport have shown infringement because the BT-PSC is not an interface module (required by

Claims 1 and 9) and does not communicate with the mobile phone (required by Claim 9).  Peiker

reiterates that the functionalities of the BT-PSC are solely those which were necessary to replace

the wired connection in the PSC with the Bluetooth connection.  *Id.* at 12-23.

3. <u>Cellport Reply</u>.

Cellport notes that Peiker failed to address the signal processing feature of the BT-PSC.

This was critical to the Tenth Circuit's order and differentiates the PT-PSC from the PSC.  ECF

No. 295 at 13-14.  Moreover, while the BT-PSC may not "generate" commands, it does "send"

and "receive" commands that are generated elsewhere.  *Id.* at 14.

As for the "revocation" of the '456 patent, Cellport argues that it is entitled to royalties

up to the moment when the EPO Board of Appeal dismissed Cellport's appeal of the EPO's

earlier determination that the patent was invalid.  In support Cellport provides a quotation from a

treatise and cites several cases.  *Id.* at 7-10.[8]

---

[8] I denied Peiker's motion for leave to file a sur-reply.  ECF No. 298.

### D.  Resolution on Remand.

First, I remain convinced that Cellport has not demonstrated that the BT-PSC infringes

the '456 patent.  Because I (mistakenly) found that the BT-PSC did not perform signal

processing functions in my January 2, 2013 order, I did not address other arguments as to why

the '456 patent does not cover this product.  The evidence on the other requirements of the patent

favors Peiker.  As indicated, Peiker presented evidence that the BT-PSC is not an "interface

module" because it does not have a "first processor" that sends commands to a "second

processor" housed by the holding member as required by independent claim 1 of the '456 patent.

The commands are between the holding member and the vehicle's head unit.  The BT-PSC does

not communicate with the first and second communication device (mobile phones) as required

by Claim 9.  In contrast, Cellport presented essentially no evidence regarding how the BT-PSC

infringes the '456 patent.  Rather, it put its eggs in the basket of arguing, unsuccessfully, that the

BT-PSC was a docking station covered under paragraph 1.17(i) of the License Agreement.

In short, Peiker's evidence that the functionalities of the BT-PSC are solely what is

necessary to replace the wired connection with the Bluetooth connection is more credible and

persuasive than Cellport's arguments now that attempt to piggyback on evidence introduced for

other purposes.

In any event, I conclude that even if the BT-PSC could be said to infringe the '456 patent,

it is a moot point given the action of the European Patent Officer and its Board of Appeal.

Cellport cites several U.S. cases for the proposition that a licensee is required to pay royalties

until the day when the patent is declared void.  I will return to those cases below.  But first, I note

that in an effort to distinguish a leading U.S. case on the subject, *Lear, Inc. v. Adkins,* 395 U.S.

653 (1969), Cellport argues that the *Lear* "exception" involves U.S. patent policy and does not

apply in the context of foreign patents.  Cellport cites *MedImmune, LLC v. PDL BioPharma,*

*Inc.,* No. C 08-5590, 2011 WL 61191, at *24 (N.D. Cal. Jan. 7, 2011) (refusing to apply *Lear* to

"foreign patent schemes which may be based upon different, even conflicting, policy

decisions.").  ECF No. 295 at 8.  Cellport notes that Peiker agrees on this point.  *Id.* at 9.  But

Cellport's argument proves too much.  If *Lear* does not apply to foreign patents (such as the '456

patent), then neither would the other U.S. cases on which Cellport relies.

 If, as Cellport argues, European law applies, then Cellport's '456 patent argument fails.

It is undisputed that, under European law, the '456 patent was determined to be void *ab initio.*  It

is difficult for me to understand how Peiker could be ordered to pay royalties on a patent that has

been declared invalid or void from the outset.

 But if one views U.S. cases interpreting U.S. patent law as applicable to the '456 patent, I

still disagree with Cellport's position.  I begin with *Lear v. Adkins, supra.*  Adkins developed a

method of construction of gyroscopes that improved accuracy and reduced cost.  He applied for a

patent, but while the application was pending, Lear agreed to pay royalties for the use of Adkins'

method.  A patent did issue some five years later, but in the meantime, Lear had become

convinced that a patent would never issue and stopped paying royalties.  Once the patent issued,

Adkins sued Lear for breach of contract in state court.  Lear asserted patent invalidity as a

defense.

 Noting the competing demands of the common law of contracts and the federal law of

patents, the majority concluded that the public interest in permitting full and fee competition in

the use of ideas outweighed the requirements of contract doctrine.  395 U.S. at 670.  Adkins'

arguments that that Lear must pay royalties accruing before the patent issued and for the entire

17

17-year patent period regardless of the validity of the patent were deemed "extreme" and unacceptable. *Id.* at 672. That would give the licensor "the incentive to devise every conceivable dilatory tactic in an effort to postpone the day for final judicial reckoning," and it "would undermine the strong federal policy favoring the full and free use of ideas in the public domain." *Id.* at 673-74. Accordingly, the Court held that Lear was not required to pay royalties accruing after the patent issued if Lear could prove patent invalidity. *Id.* at 674.

To be sure, there are subsequent cases that interpret *Lear* as applied to particular facts. Cellport cites *Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 465 F.2d 1253, 1257-60 (6th Cir. 1972 (*Troxel I*) and 489 F.2d 968, 973 (6th Cir. 1973) (*Troxel II*). Schwinn licensed Troxel to manufacture and sell bicycle seats embodying Schwinn's design patent. Later, in a lawsuit filed by Schwinn against an alleged third party infringer, the patent was held invalid. Troxel then sued Schwinn to recover the royalties it had paid or, at least, the royalties it had paid subsequent to the district court's invalidity decision.

In *Troxel I* the court noted that it had long been the rule in the Sixth Circuit that a final adjudication of invalidity operates as an "eviction" from the license and terminates the licensee's obligation to continue making royalty payments but does not give the licensee a right to recoup payments already made. 465 F.2d at 1255. The court thus held that Troxel was not entitled to recover royalties it had paid before the final decision on invalidity. However, the court also stated, citing *Lear,* "A licensee may at any time cease royalty payments, secure in the knowledge that the invalidity of the patent may be urged when the licensor sues for unpaid royalties. If the patent is declared invalid through the efforts and expenditures of another, no further royalties are due under the license agreement." *Id.* at 1260 (dictum).

In *Troxel II,* the court seemed to contradict the latter statement, indicating that "It was our intention in Troxel I that the District Court on remand would compute royalties due for products sold prior to the eviction and enter judgment for this amount against Troxel." 489 F.2d at 973. That too was dictum, since Troxel did not cease making royalty payments prior to the appellate holding of invalidity.

In *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991 (Fed. Cir. 1985), Cordis, the licensee of two Medtronic patents, sued for a declaratory judgment that the patents were invalid. Cordis obtained an order from the trial court "*pendent lite*" permitting Cordis to deposit ongoing royalty payments in escrow and enjoining Medtronic from terminating the license agreement for non-payment of royalties. The Federal Circuit vacated the escrow and injunction orders, holding that while the Supreme Court held in *Lear* that a licensee cannot be required to continue to pay royalties while it is challenging patent validity in the courts, the licensee cannot continue to invoke the protections of the licensing agreement without paying the royalties provided by the agreement. *Id.* at 995.[9]

In *Nebraska Engineer Corp. v. Shivvers,* 557 F.2d 1257 (8th Cir. 1975), the licensee sought a declaration of invalidity of the patent and, as in *Cordis,* obtained orders prohibiting the licensor from terminating the license agreement and authorizing the licensee to pay royalties into an escrow account pending resolution of the validity challenge. The Eighth Circuit panel noted that *Lear* had held that a licensee was not required to continue to pay royalties under a licensing agreement while the validity of the underlying patent was being adjudicated. However, it said, nothing in *Lear* precluded the licensor from treating nonpayment as grounds for termination of the license agreement. *Id.* at 1259-60. Moreover, in the meantime the Second Circuit had

---

[9] The court also indicated that Cordis would not necessarily risk forfeiture of royalties paid while litigating invalidity. It distinguished *Troxel* as prohibiting recoupment of royalties paid prior to adjudication of invalidity only when the challenge to the patent was made by a third party. *Id.* at 996.

determined that if a licensee wishes to invoke the protections of the license agreement, it should be required to continue paying royalties to the licensor. *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184 (1977). The Eighth Circuit indicated its agreement with the Second Circuit's reasoning but held that it did not need to reach or decide whether the licensor or licensee would be entitled to royalties paid during the pendency of the invalidity litigation, only that the district court's order was erroneous. *Id.* at 1260.

The closest Tenth Circuit case I located is *Hull v. Brunswick Corp.*, 704 F.2d 1195 (1983). As relevant to the present case, one issue was whether patent invalidity was a proper defense to a suit for royalties. The court noted that *Lear* permits licensees to refuse to pay royalties on a patent they believe to be invalid and to defend an action for royalties on the basis of patent invalidity. *Id.* at 1203. However, if the licensee wishes to preserve patent invalidity as a defense to litigation over unpaid royalties, it must notify the licensor that it is suspending payments because it questions the validity of the patent. *Id.*

None of these circuit or district court cases convinces me that Peiker owes Cellport royalties on the '456 patent. *Troxel* involved refunding of royalty payments made, not an issue here. *Cordis* and *Nebraska Engineering* are cases that recognize the inequity of a licensee's forcing a licensor to continue to provide the benefits of a license agreement without getting paid. That is not an issue here either. Unlike products that qualified as Licensed Products, the License Agreement did not require Peiker to pay royalties on the BT-PSC except to any extent that a Licensed Patent required the payment of royalties. Peiker had no need to continue to receive the benefits of the License Agreement while the invalidity litigation was pending. If the '456 patent had turned out to be valid (and if it were determined that the BT-PSC infringed that patent), then Peiker would owe retroactive royalties plus interest. However, the '456 patent was determined

to be void *ab initio*.  In my view, *Lear* supports Peiker's position that no royalty payments are owed on these facts.

## ORDER

For the foregoing reasons, royalties and interest are owed on Peiker's sales of the CKVI cradle in an amount to be determined by the parties.  Royalties are not owed on the BT-PSC product.

DATED this 13th day of October, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge